# EDWARD KAMINSKI v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY.[1]

June 6, 1930.

Nos. 27,897, 27,906.

*F. W. Root, C. O. Newcomb, A. C. Erdall* and *W. H. & H. W. Gillitt,* for appellant railway company.

*Tautges, Wilder & McDonald* and *F. M. Miner,* for appellant Kaminski.

TAYLOR, C.

Plaintiff recovered a verdict for personal injuries. Defendant made a motion for judgment notwithstanding the verdict. Plaintiff

[1]Reported in 231 N. W. 189.

made a motion for a new trial. Both motions were denied and judgment was entered. Defendant appealed from the judgment. Plaintiff appealed from the order denying his motion for a new trial. The question presented on plaintiff's appeal is whether the court erred in instructing the jury that the federal safety appliance act did not apply in this case.

The accident happened in what is known as the heavy repair yard of defendant in the city of Milwaukee, Wisconsin. This is the yard to which cars needing extensive repairs are taken and is used only for making repairs. It is not directly connected with any main line. Cars on a main line can reach it only by being first taken to another yard and then transferred from that yard to this. Cars received at this yard are first placed on a track designated as track 26 where they are inspected and the repairs to be made are noted. They are then transferred to a track termed a stripping track where defective parts are removed. They are then transferred to another track where a particular part of the repair work is done by the set of repairmen at that track. They are then transferred to another track where another particular part of the repair work is done by the set of repairmen at that track; and so on until the repairs are completed. The cars are transferred from one track to another by a switching crew consisting of an engineer, fireman, conductor or foreman, and two brakemen or switchmen. Plaintiff was the rear brakeman or fieldman of this crew. The repairmen worked in the yard in the daytime, and for that reason the switching was done at night.

The purpose of the movement in which the accident happened was to take five box-cars from track 14 and place the rear car and two others on track 17. The cars were standing a few feet apart. The engine was backed from the lead track onto track 14 and coupled to the first car, and couplings were then made with the other cars. Plaintiff attended to the making of these couplings. When they were completed he was standing on the right-hand side of the rear car. He signaled the engineer to go ahead. As the cars began to move he put his left foot in the stirrup near the rear end of the rear

car and grasping the grabiron with his left hand attempted to pull himself up to the side of the car intending to ride to the switch. The grabiron came off, and he fell backward to the ground, twisting and injuring his right knee.

On the preceding night this crew had moved this car from the stripping track to track 14. On the stripping track the roof and floor of the car had been removed and also the front half of the side wall on the side toward plaintiff at the time of the accident. The rear part of this side wall still remained, and the stirrup was still in place. The grabirons are fastened to the side of a car by bolts which pass through the wall of the car and through the ends of the grabiron. The heads of the bolts are on the inside of the car and the nuts on the outside of the grabiron. As the grabiron in question was to be removed, the nuts had been burned off with an acetylene torch, and it simply rested on the ends of the bolts with nothing to hold it in position. When grabirons were to be removed or the bolts holding them in place were to be taken out the nuts were burned off in this manner, and usually the grabirons either fell off or were taken off at the same time. Occasionally a grabiron was left resting on the ends of the bolts as in the present case. Plaintiff knew that the repairmen burned off the nuts in this manner but says that he had never seen a grabiron left in place after the nuts had been burned off.

Plaintiff relies upon Texas & P. Ry. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. ed. 874, as sustaining his contention that the facts bring the case within the federal safety appliance act. In that case the switching crew of which Rigsby was a member were engaged in moving "bad order" cars from a spur track on one side of the main line to the shops on the other side of the main line. Three cars were hauled from the spur onto the main line where they were to remain while the crew went back for others. Rigsby rode on the top of one of these cars and set the brakes to hold them on the main line. While descending from the car he fell owing to a defective grabiron and was injured. He was held to be within the protection of the safety appliance act. The court cites and follows

Southern Ry. Co. v. U. S. 222 U. S. 20, 26, 32 S. Ct. 2, 4, 56 L. ed. 72, in which it was held that the statute as amended "is intended to embrace all locomotives, cars and similar vehicles used on any railroad which is a highway of interstate commerce." It also cites G. N. Ry. Co. v. Otos, 239 U. S. 349, 36 S. Ct. 124, 125, 60 L. ed. 322, in which the switching crew were engaged in breaking up a train and at the time of the accident were moving three cars one of which had a defective coupler and was marked for repairs and was to be switched to a repair track. Otos was injured while uncoupling this car from another loaded car. The court held that the safety appliance act applied and said [239 U. S. 351]:

"The supplementary act of April 14, 1910, c. 160, § 4 [36 Stat. at L. 299, Comp. Stat. 1913, § 8621], relieves the carrier from the statutory penalties while the car is being hauled to the nearest available point where it can be repaired, but expressly provides that it shall not be construed to relieve from liability for injury to an employe in connection with the hauling of the car."

We understand these cases to hold that, although a car with defective appliances is being moved for the purpose of taking it out of service and placing it at the point where it is to be repaired, it is within the operation of the safety appliance act during such movement. But we have been cited to no case and know of none which goes to the extent of holding that a car with defective appliances which has been taken out of service and has been placed on a repair track to be repaired in a yard used exclusively for the purpose of making repairs, and which is actually in process of being repaired, is still within the operation of the safety appliance act.

In B. & O. R. Co. v. Hooven (C. C. A.) 297 F. 919, a workman was injured because of an unsafe running board and grabiron on an engine which at the time had been temporarily withdrawn from service and was undergoing minor repairs in a roundhouse. The court pointed out the distinction between the statutory test of liability under the employers liability act and the statutory test under the safety appliance act and said [297 F. 922]:

"In actions under the safety appliance act the statutory criterion is whether the car is 'in use' 'on its line' within the true purpose and scope of the act."

After observing that the safety appliance act forbids the "use" or "hauling on its line" of cars with defective equipment and requires a high degree of diligence in discovering and repairing defects, the court said [297 F. 923]:

"Can it be said that it is the intention of the safety appliance act to penalize such diligence by extending the absolute liability of the carrier through the period of replacement and repair, and reaching even a case where the insecure condition of the appliance which failed was the natural and temporary result of the reconditioning process? We think such contention untenable, unless supported by specific direction of the statute."

After referring to the statute and to the fact that under it liability attached during the time that the car was being hauled from the point where the defect was discovered to the point where it was to be repaired, the court said [297 F. 924]:

"In a number of cases, where the carrier has been held liable for injuries caused proximately by the defective appliances of a car withdrawn from service, the liability has been sustained on the theory that the injury occurred during the time when the defective car was being hauled to the nearest available point for repairs, or in connection with such moving or hauling."

The court cited the Otos case and the Rigsby case and, after making some observations as to when the movement to the place of repair should be deemed to have reached the point where the statute no longer applied, said [297 F. 924]:

"While there may be some indication (Texas Railway v. Rigsby, supra) that intermediate shiftings at the repair point yard are part of the unitary journey of the car from the point where the defect is discovered to the place of actual repair, there are no cases from which any holding may be inferred to the effect that a car at rest at the repair point and not in relation to movement of other cars, is a

part of such unitary movement as is covered by the exception to the proviso in section 4 of the 1910 amendment."

In Sherry v. B. & O. R. Co. (C. C. A.) 30 F. (2d) 487, a car had been placed on a ladder track and reported to the plaintiff, an inspector and repairman, as having a defective brake. While he was trying the brake to see if it could be used it broke and he was injured. After referring to the provisions of the statute the court said [30 F. (2d) 489]:

"It is to be noted that the inhibited act on the part of the railroad company in each is 'the hauling or permitting to be hauled or used' on its line any car with the required equipment in defective condition. This constitutes the 'violation of the act' we have above referred to in statement of the general principles deduced from precedent. It has accordingly been held by this court that the act has no application to equipment withdrawn from service and undergoing minor repairs preparatory to early return to service. B. & O. R. Co. v. Hooven (C. C. A.) 297 F. 919."

The court referred to the decision in the Rigsby case and said [30 F. (2d) 489]:

"This decision must be interpreted as based upon the theory that the taking of 'bad order' cars to the shops for repair is a 'part of the unitary journey of the car from the point of first discovery to the precise point of actual repair,' and therefore within the provision for continuance of civil liability under 45 U. S. C. § 13 (45 USCA, § 13). In none of the cases cited was liability held to attach after withdrawal from service had been completed and during the course of repair."

Although not directly in point, see also Industrial Acc. Comm. v. Davis, 259 U. S. 182, 42 S. Ct. 489, 66 L. ed. 888; Noftz v. B. & O. R. Co. (C. C. A.) 13 F. (2d) 389; Hart v. Central R. Co. (N. J. Sup.) 147 A. 733.

We reach the conclusion that where a bad order car has been withdrawn from service and taken to and placed in a repair yard where it is being repaired, subsequent movements of the car made

in the course of the work and for the purpose of facilitating it are not within the operation of the safety appliance act.

The question presented by defendant's appeal is whether plaintiff is barred from recovering on the ground that he assumed the risk.

Plaintiff pleaded the Wisconsin statute relating to the liability of railroad companies for injuries sustained by their employes. Defendant insists that that statute does not apply to the present case for the reason, among others, that the statute expressly provides that it "shall not apply to employes working in shops or offices" [Wis. St. 1927, § 192.55]; and that the yard in question being devoted solely to the work of making repairs is a shop to all intents and purposes. This contention is probably true, but it is not necessary to determine that question for the statute leaves the doctrine of assumption of risk in force in such a case as this. It abrogates that doctrine only where a violation by the carrier of a statute enacted for the safety of the employe contributes to the injury. As the safety appliance act does not apply, it does not appear that any statute was violated.

In Kelley v. C. St. P. M. & O. Ry. Co. 35 Minn. 490, 491, 29 N. W. 173, 174, a bad order car had been placed on a repair track. The plaintiff's intestate was a brakeman in the switching crew which were engaged in moving the car and had kicked it upon another track. While the car was moving slowly plaintiff's intestate

"attempted to mount it by stepping upon the brake-beam, and seizing the brake-staff so as to raise himself up. The brake-staff gave way; he fell, and the car ran over and killed him. The evidence tends to show that the brake-staff had been nearly, if not quite, broken off before he took hold of it."

After a further recital of the facts the court said [35 Minn. 492]:

"The aspect of the case is, then, this: The plaintiff's intestate is notified *generally* that the car is in bad order, so that it has been necessary to withdraw it from ordinary service and lay it up for repairs. When he comes to handle it, he does so knowing that, for some reasons not disclosed to him, it is not suitable for use in the ordinary way. Not knowing what, in particular, those reasons are,

if he handles the car at all, he handles it as a car which is unsuitable for use, and at his own risk, not only for its defects,—at least, for such as are apparent to or would fairly be suggested by ordinarily diligent and careful observation, like those of the brake on this car,—but also at the risk of the negligence of his fellow-servants in handling the same. We discover nothing in the testimony to take the case at bar out of the full application of this proposition. The plaintiff's intestate must be taken to have assumed the risk of handling this car as one in bad order, which it therefore might be dangerous to handle in the ordinary way, and as to which, in the absence of any definite information as to the respect in which it was defective, the burden of ascertaining the defect and source of danger was cast upon and assumed by him. As he took this risk and burden upon himself, he cannot hold the defendant responsible for it. This is the theory upon which Fraker v. St. Paul, M. & M. Ry. Co. 32 Minn. 54, (19 N. W. Rep. 349), necessarily proceeds. It can stand upon no other."

The court cites Watson v. H. & T. C. Ry. Co. 58 Tex. 434; Flanagan C. & N. W. Ry. Co. 45 Wis. 98; Id. 50 Wis. 462, 7 N. W. 337; C. & N. W. R. Co. v. Ward, 61 Ill. 130; McCosker v. Long Island R. Co. 84 N. Y. 77; Wharton, Neg. (2 ed.) § 214; 2 Thompson, Neg. (1 ed.) p. 1009. The cases cited sustain the rule applied; and the Wisconsin case, which was before the supreme court of that state twice, perhaps applies a more stringent rule, for in that case a train of ore cars which had been unloaded and which contained some defective cars was being run to the yard where the cars were to be inspected and the defective ones removed from the train. On one of these cars a "jaw brace" used as a step had been broken. A brakeman attempting to mount the car by means of this step fell and was injured. It was held that he assumed the risk for the reason that he knew there were defective cars in the train, and that it was being run to the repair yard for the purpose of taking them out of the train and leaving them there to be repaired. The following cases not cited in the Kelley case are to the same effect. Chesapeake & O. R. Co. v. Hennessey (C. C. A.) 96 F. 713; Southern Ry.

Co. v. Lyons (C. C. A.) 169 F. 557, 25 L.R.A.(N.S.) 335; Arnold v. D. & H. C. Co. 125 N. Y. 15, 25 N. E. 1064; Buschalewski v. N. Y. C. R. Co. 105 Misc. 541, 173 N. Y. S. 506; Yeaton v. Boston & Lowell R. 135 Mass. 418; Gardstrom v. L. E. White Lbr. Co. 21 Cal. App. 744, 132 P. 842. All except the Massachusetts case are later than the Kelley case, 35 Minn. 490, 29 N. W. 173. The Massachusetts case is a leading case in that state. The circuit court of appeals which rendered the decision in Chesapeake & O. R. Co. v. Hennessey, 96 F. 713, was composed of Judges Taft, Lurton and Clark, and the opinion written by Judge Lurton reviews the authorities and among others cites the Kelley case as stating the correct rule. We have been cited to no case and have found none holding otherwise. All the cases we have found hold that after a defective car has been withdrawn from service and placed on a repair track where it is to be repaired employes who move it thereafter are charged with notice that they are moving a defective car and assume the risk of handling it in its defective condition. Cases involving cars within the operation of the safety appliance act or cars which had not been withdrawn from service to be repaired are not in point.

We reach the conclusion somewhat reluctantly that plaintiff had assumed the risk and therefore is not entitled to recover. The result is that on plaintiff's appeal the order denying a new trial must be and is affirmed; and on defendant's appeal the judgment must be and is reversed and judgment directed for defendant.

So ordered.