[Civ. No. 12848. First Dist., Div. One. July 24, 1945.]

FELIX E. COMPTON, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Carlson, Collins & Gordon for Appellant.

Hildebrand, Bills & McLeod and Louis H. Brownstone for Respondent.

PETERS, P. J.—Plaintiff, while employed as a machinist in the roundhouse of defendant railroad company at Yuma, Arizona, and while working on a locomotive of defendant admittedly engaged in interstate commerce, received injuries for which this action was brought. The locomotive was in an

unsafe condition in that the check valve on the boiler was defective causing steam to escape into the pump on which plaintiff was working. It is not contended that the unsafe condition was caused by the negligence of defendant or its employees, the sole basis of liability being that defendant violated the Boiler Inspection Act. (45 U.S.C.A. § 23.) Under that statute, in the event of a violation, liability is absolute, is not dependent on negligence, and contributory negligence of the employee is no defense. The trial court, after denying defendant's motions for a nonsuit and for a directed verdict, submitted to the jury the question as to whether such statute had been violated. The jury brought in a verdict for $4,000, and upon entry of judgment, defendant appeals. Its sole contention is that, inasmuch as the locomotive here involved was admittedly undergoing running repairs in the roundhouse of defendant at the time of the accident, the Boiler Inspection Act, as a matter of law, has no application, liability, if any, in such cases being based on the Federal Employers' Liability Act (45 U.S.C.A. §51) under which statute negligence constitutes an indispensable element of liability.

45 U.S.C.A., section 23, provides: "It shall be unlawful for any carrier *to use* or permit to be used *on its line* any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and *safe to operate in the service to which the same are put,* that the same *may be employed in the active service* of such carrier without unnecessary peril to life or limb, . . ." (Italics added.)

Under this section the carrier is under an absolute duty to keep its locomotives in such condition that they may be *"employed in the active service of such carrier* without unnecessary peril to life or limb." Unless the locomotive is in such condition it is made unlawful "to *use* or permit" it "to be *used on its line."* The question here is whether a locomotive detached from all cars and placed in a roundhouse for running repairs is in "use" "on its line" within the meaning of the statute.

The facts are not in dispute and are as follows: Yuma, Arizona, is a terminal point of defendant. When a freight train reaches Yuma its engine is disconnected from the train and is taken by the crew to a lead or turn in track where it is turned over to a hostler, a yard employee, who takes it to the roundhouse, where the locomotive is inspected and serviced

before its next run. The roundhouse is about two blocks from the main lines. So-called "running repairs" are made at the roundhouse. These are repairs of a minor nature that do not require more than twenty-four hours to perform. If more extensive repairs are needed the locomotive is deemed "in the hole" and "out of service," and labeled "withdrawn from service." While a locomotive is being inspected and serviced, or is undergoing running repairs in the roundhouse, it may be called by the transportation office for duty. The foreman of the roundhouse then determines whether the locomotive may go out or whether further time for the repairs is needed.

The locomotive here involved had completed a run and was brought to the roundhouse by the hostler. Plaintiff reported to work at 7 a.m. at the roundhouse on the day of the accident and was instructed by the foreman to repair the leaking pump on the engine. The accident occurred at about 7:15 a.m. At that time the engine had been "called" for 8 a.m., that is, the transportation office had assigned it to a particular train leaving at that hour. Although the repairs were not completed, the roundhouse foreman had indicated that the locomotive would be ready for service at the requested time. This would mean that about 7:30 a.m. the locomotive would be driven on a lead out track by the hostler and delivered to the crew.

When the plaintiff was assigned the duty of repairing the pump the locomotive had a fire in the fire box and steam up in the boiler. The job required the installation of a new gasket in the head of the hot water chamber of the feed water pump. While removing the cap to install the gasket, steam and hot water escaped and plaintiff received severe burns on the face and body. Subsequent investigation revealed that a small piece of metal had become lodged under the boiler check valve causing it to remain partially open and thus permitting steam to escape from the boiler into the feed water pump on which the plaintiff was working. It is conceded that if the Boiler Inspection Act is applicable, this unsafe condition constituted a violation of the act.

The trial court submitted to the jury the question as to whether at the time of the accident the locomotive was in use on defendant's line within the meaning of the Boiler Inspection Act. We are of the opinion that this was error in that it appears from the uncontradicted evidence, as a matter of

law, that that statute is not applicable to the facts here involved.

■ There appears to be no case directly in point interpreting the Boiler Inspection Act, but there are several cases directly in point interpreting the Safety Appliance Act which contains language very similar to that used in the Boiler Inspection Act. The leading case is *Baltimore & O. R. Co.* v. *Hooven*, 297 F. 919. In that case liability was sought to be predicated upon a violation of the Safety Appliance Act which also creates an absolute liability. As it then read that statute provided that it shall be unlawful "to haul or permit to be hauled or used on its line any car" not equipped with certain safety appliances. The plaintiff, a machinist, was working upon a locomotive that had been sent to the roundhouse the day before the accident for its regular monthly inspection and for running repairs. At the time of the accident, as in the instant case, the locomotive had been called for service. It was customary for engines brought into the roundhouse to be sprayed with oil to protect them from rust. The oil was then washed off with warm water. The engine had been sprayed but the oil had not yet been removed. The plaintiff in descending from the top of the boiler slipped on a steel running board on which there was some oil, and was injured. He was unable to save himself by grabbing the safety grab rails because they also were covered with oil. The Circuit Court of Appeals reversed the judgment for the plaintiff. In so doing the court stated the question involved as follows (p. 921): "Does the absolute liability of the railroad for the appliances and their security as fixed by the statute follow its instrumentalities of transportation beyond their actual present use or hauling, or, more specifically, is it the intent of the act to have the absolute liability imposed by it attach to the vehicle during such time as it is withdrawn temporarily from actual service and after it has reached the place of repair and is undergoing conditioning and repair for the purpose for which it is intended and for the use to which it is assigned?"

After pointing out the test for liability under the Employers' Liability Act is entirely different from that under the Safety Appliance Act, the court stated that under the latter statute the test was whether the car was in "use" "on its line," and that under that test "it is difficult to see wherein the safety of a highway of interstate commerce may be endangered by a locomotive withdrawn from service and at rest

in a stall of the railroad's roundhouse undergoing repairs, even though such withdrawal be but temporary.''

The court then held (p. 922): ''The act forbids the 'use' or 'hauling on its line' of prescribed cars. Whatever ambiguity lies in the statute results from the susceptibility of the term 'use' to an interpretation equivalent in meaning to the terms 'employ' or 'engage,' or the phrase 'habitually use,' as distinguished from the term 'use' as implying actual present use. Having in mind the broad aims and purpose of the statute and its specific provisions, we think there can be no doubt as to the meaning of its prohibitory clause. The statute imposes an absolute liability on the carrier to equip its vehicles with safety appliances and to keep such appliances secure. The act of equipping the vehicle originally with the safety appliances and the act of repairing an appliance which becomes defective in use are acts in compliance with and not in violation of law, and are not in our judgment acts which the law intends to penalize. The process of conditioning an engine and preserving it from deterioration through rust by spraying it with oil appears to be, so far as this record is concerned, the usual and necessary treatment of the engine during monthly inspection, contributing to the safety of the apparatus while in actual use. If during such treatment the safety appliances are rendered temporarily insecure by the presence of oil upon them, it does not seem to us to present a condition that comes within the purview of the act, when as in this case the engine is completely withdrawn from all relationship to the highways of interstate commerce, and from all connection with the movement of trains thereon.

''Another consideration also contributes to this conclusion. Assuming it to be the wise and humane purpose of the act to secure the utmost of safety to travelers and employees upon the highways of interstate commerce, whatever may be the source of the dangers which threaten it, it becomes the clear duty of the carrier in conformity with such purpose, as was suggested by this court (opinion of Judge Knappen, *Southern Ry. Co.* v. *Snyder* 187 F. 492, at page 497 [109 C.C.A. 344]), to exercise a high degree of diligence in discovering and repairing defects in its safety appliances and in withdrawing the car from commercial use while they exist. Such diligence seems also to be imposed on the carrier by the Boiler Inspection Act (Comp.St. §8630 et seq.) and related statutes,

Can it be said that it is the intention of the Safety Appliance Act to penalize such diligence by extending the absolute liability of the carrier through the period of replacement and repair, and reaching even a case where the insecure condition of the appliance which failed was the natural and temporary result of the reconditioning process? We think such contention untenable, unless supported by specific direction of the statute.''

The plaintiff in the instant case seeks to distinguish the Hooven case in that in the latter case the unsafe condition was a reasonably necessary incident of processing the locomotive, which is not true in the present case. While it is true that this factual difference exists, such difference in no way affects the basic question of interpretation as to whether an engine temporarily removed from service and undergoing temporary repairs is in ''use'' on the carrier's ''line.'' The case is directly in point on this basic issue.

Other cases support the conclusion that the statute does not apply to locomotives removed from actual service and undergoing repairs. In *New York, C. & St. L. R. Co.* v. *Kelly,* 70 F.2d 548, an injured employee based his action on violations of both the Safety Appliance Act and the Federal Employers' Liability Act. It was admitted that the car was in interstate commerce. Judgment for plaintiff was reversed by the Circuit Court. The plaintiff was a brakeman on a yard crew. The car in question was defective and was so marked. It was undergoing repairs on a repair track where it had been for three days. Plaintiff was injured when he fell because of the lack of a grab iron which had been removed in the course of repairs. The repairs were undoubtedly more extensive than running repairs. In holding that as a matter of law there had been no violation of the Safety Appliance Act the court stated (p. 550): ''After a defective car reaches the place of repair, the Safety Appliance Act is inapplicable because such car has been withdrawn from service and is not 'in use' under the provisions of the act, nor does mere shifting of cars within the place of repair put the car 'in use' within the meaning of the statute.'' (Citing several cases, including the Hooven case, *supra.*)

In *Sherry* v. *Baltimore & O. R. Co.,* 30 F.2d 487, also a Safety Appliance Act case, the car in question had been cut from the train, placed on a ''ladder'' track, and reported as having a defective brake. Plaintiff was an inspector and, while in-

specting the brake, was injured by reason of its defective condition. The Circuit Court affirmed a directed verdict for defendant, holding that, as a matter of law, the Safety Appliance Act had no application. The court stated (p. 489) : ''The absolute liability above referred to is implied from these statutory provisions, and it is to be noted that the inhibited act on the part of the railroad company in each is 'the hauling or permitting to be hauled or used' on its line any car with the required equipment in defective condition. This constitutes the 'violation of the act' we have above referred to in statement of the general principles deduced from precedent. It has accordingly been held by this court that the act has no application to equipment withdrawn from service and undergoing minor repairs preparatory to early return to service. *Baltimore & O. R. Co.* v. *Hooven* (C.C.A.), 297 F. 919. *Cf. McCalmont* v. *Pennsylvania R. Co.* (C.C.A.) 283 F. 736.

''In the instant case the defective car was not being hauled or used by the defendant, except in that it was stored temporarily upon one of the ladder tracks. It had been withdrawn from use for the very purpose of undergoing repair. No movement was immediately contemplated, and no action of setting the brakes was necessary, save as incident to inspection and repair.''

Another case discussing the question involved, also a Safety Appliance Act case, is *Kaminski* v. *Chicago M., St. P. & P. R. Co.*, 180 Minn. 519 [231 N.W. 189], where a judgment for plaintiff was reversed. The car in question was in the heavy repair yard of defendant and was undergoing extensive repairs. Cars were customarily transferred from one track to another in the course of making repairs. While the car in question was being thus moved, plaintiff, in attempting to pull himself up the side of the car, grasped the grab iron. It came off and he fell to the ground. The grab iron was to be removed in the course of the repairs and the nuts holding it in place had been burned off. Usually the grab irons fell off or were taken off when the bolts were burned, but in this case the grab iron remained insecurely on the car. The court said : ''We understand these cases to hold that, although a car with defective appliances is being moved for the purpose of taking it out of service and placing it at the point where it is to be repaired, it is within the operation of the Safety Appliance Act during such movement. But we have been cited to no case

and know of none which goes to the extent of holding that a car with defective appliances which has been taken out of service and has been placed on a repair track to be repaired in a yard used exclusively for the purpose of making repairs, and which is actually in process of being repaired, is still within the operation of the Safety Appliance Act." (P. 190.)

After analyzing both the Hooven and Sherry cases, *supra*, and citing certain other cases, the court concluded (p. 191): "We reach the conclusion that, where a bad order car has been withdrawn from service and taken to and placed in a repair yard where it is being repaired, subsequent movements, of the car made in the course of the work and for the purpose of facilitating it are not within the operation of the Safety Appliance Act."

A case discussing the Boiler Inspection Act and apparently interpreting it when it provided that it applied to locomotives "in moving interstate traffic" is *Harlan* v. *Wabash Ry. Co.*, 335 Mo. 414 [73 S.W.2d 749]. In that case the locomotive was undergoing inspection and conditioning in the roundhouse. During inspection it was discovered that the mechanical stoker was jammed. Plaintiff, a machinist's helper, was injured during the course of the repairs when he stepped into an open trap door in the engine vestibule and his foot was crushed by a revolving propeller. It was held that no cause of action under the Boiler Inspection Act had been proved first, because leaving open the trap door was not a mechanical defect, and secondly, because the engine was not in use or moving in interstate commerce. In connection with this last holding the court stated (p. 753): "Nor can plaintiff recover under the Boiler Inspection Act for the reason that the engine in question on which plaintiff was working when injured was not at the time in use or moving in interstate commerce, as we held in *Brady* v. *Wabash Ry. Co.*, 329 Mo. 1123, 49 S.W.2d 24, 29, 83 A.L.R. 655. This act, like the Safety Appliance Act (45 U.S.C.A. §1 et seq.), while applicable only to interstate commerce, is narrower in its scope and application than is the Federal Employers' Liability Act. (45 U.S.C.A. §51 et seq.). The latter act covers negligence of an interstate carrier resulting in the injury or death of an employee when the negligent act or omission is directly connected with interstate transportation and the instrumentalities thereof, or is so nearly related to it as to be practically a part thereof. The Boiler Inspection Act, like the Safety Appliance Act, does not rest

on negligence, but is absolute in its requirements and is restricted to locomotive engines when in use in moving interstate traffic. It is only when in such use that the engine and appliances are required to be 'in proper condition and safe to operate in the service to which the same are put.' We pointed out in the Brady Case that the Safety Appliance Act, and the same is true of the Boiler Inspection Act, does not apply to cars or engines when withdrawn from active use in interstate commerce for temporary repairs, though intended to be again and shortly put in such active use; . . .

"It follows from these rulings that under the facts shown here the engine in question was not in actual use in moving interstate commerce at the time of the plaintiff's injury, but was so far withdrawn from such active use as to make the provisions of the Boiler Inspection Act inapplicable. But it must not be concluded that this is true as to the broader provisions of the Federal Employers' Liability Act."

These cases clearly establish that a locomotive sent to a roundhouse for temporary repairs, is not, while undergoing such repairs, in "use" on the carrier's "line" and is not, therefore, within the provisions of the Boiler Inspection Act.

Plaintiff relies principally on three cases to sustain his contention that the act is applicable—*New York Cent. R. Co.* v. *Marcone*, 281 U.S. 345 [50 S.Ct 294, 74 L.Ed. 892] ; *Baltimore & O. R. Co.* v. *Kast*, 299 F. 419, cert. den. 266 U.S. 613 [45 S.Ct. 95, 69 L.Ed. 468] ; and *Brady* v. *Terminal R. R. Assn.*, 303 U.S. 10 [58 S.Ct. 426, 82 L.Ed. 614]. The first two cases are clearly not in point. In the Marcone case the employee in question was employed in a roundhouse to grease engines therein for inspection. He was killed when the engine was moved while he was apparently working on it. The action for his death was based on the Federal Employers' Liability Act, under which liability is based on the negligence of the carrier. One of the questions involved was whether the deceased employee was engaged in interstate commerce at the time of his death. The court held that he was. The same point was involved in the Kast case. The gist of the opinion is indicated by the first two headnotes which read: "A railroad employé, engaged in a work in interstate commerce, who had stopped work and was going after his lunch on the premises when injured, with the intention of returning immediately afterward to the same work, was employed in 'interstate com-

merce' at the time of injury, within Employers' Liability Act.'' ''A machinist and his helper, who at the time of the helper's injury were engaged in making running repairs to an engine in use in interstate transportation, while it was laying off between runs at a roundhouse, *held* employed in 'interstate commerce,' within Employers' Liability Act.''

These two cases are of no help at all in deciding the problem presented on this appeal. All they decided was that an employee working in a roundhouse on an engine undergoing running repairs or servicing, where such engine is normally engaged in interstate commerce, is engaged in interstate commerce within the meaning of the Federal Employers' Liability Act. The cases did not consider whether such an engine was in ''use'' on its ''line'' within the meaning of the Safety Appliance or Boiler Inspection Acts. Most of the five cases cited by defendant, and above analyzed, point out that the two tests are not synonymous. That this is so is made quite clear when the language of the Federal Employers' Liability Act is considered. 45 U.S.C.A., section 51, provides in part:

''Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . .

''Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce. . . .'' This language is obviously different from that used in the Boiler Inspection Act which makes it unlawful ''for any carrier to use or permit to be used on its line'' any locomotive unless its boiler is safe ''to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb.'' (45 U.S.C.A. §23.) This last language was carefully framed to state the thought that the absolute liability being imposed only applied while the locomotive was in actual use on the ''line'' of the company in ''active service.''

The third case relied upon by plaintiff—*Brady* v. *Terminal R. R. Assn.*, 303 U.S. 10 [58 S.Ct. 426, 82 L.Ed. 614]—is likewise not in point. Brady was an inspector for the Wabash Railway Company. He was injured while inspecting cars when a grab iron became loose. He sued the Terminal Railroad Association under the Safety Appliance Act which extends its benefits not only to employees of the defendant carrier but to any person rightfully on the premises—employee, employee of another carrier, passenger, etc.—who is injured by reason of the defective appliance. When injured Brady was inspecting a car brought by the defendant Terminal Railroad Association to yards of the Wabash line. The cars were placed on the receiving track of the Wabash line, and Brady was inspecting them to determine whether they were in proper condition to be accepted by the Wabash line when he was injured. The United States Supreme Court held that the car was still in "use" by the Terminal Railroad Association, even though not actually on a line of that company. The court was careful to point out that (p. 13) : "It is not a case where a defective car has reached a place of repair," citing with apparent approval the Hooven and Kelly cases, *supra*. The rationale of the opinion is that the car was still in "use" by the Terminal Railroad Association until accepted by the Wabash line. The case has no application to cars withdrawn from service and undergoing repairs.

The several federal statutes imposing absolute liability on railway carriers for injuries caused by defective equipment all seem to have been drawn carefully to exclude such absolute liability while the car or engine is removed from actual service, even temporarily, for repairs. These statutes appear in 45 U.S.C.A., chapter 1, sections 1-23 inclusive. Section 1 provides: "It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic" not equipped with a power driving-wheel brake. Section 2 provides that it shall be unlawful for any interstate railroad common carrier "to haul or permit to be hauled or used on its line any car used in moving interstate traffic" not equipped with an automatic coupler. Section 4 provides that it shall be unlawful for an interstate railroad carrier "to use any car in interstate commerce" not provided with grab irons. Section 5 provides that no freight cars "shall be used in interstate traffic" which do not comply with the

standard as to height of drawbars. Section 6 provides that any interstate railroad carrier using any locomotive "or hauling or permitting to be hauled or used on its line any car" in violation of the preceding provisions shall be liable to a $100 penalty for each violation. Section 11 provides that it shall be unlawful for any carrier subject to sections 1-16 of this title "to haul, or permit to be hauled or used on its line" any car subject to the provisions of these sections unless said car is equipped with certain designated safety appliances, while section 13 provides that any carrier subject to these provisions "using, hauling, or permitting to be used or hauled on its line" any car subject to sections 1-16 of this chapter not equipped as provided in sections 11-16 shall be liable to a penalty of $100 for each violation, provided that, if during a run such defect is discovered, the defective car may be hauled to a place of repair without the penalties, but civil liabilities will continue during such haul. Section 17 provides that it shall be unlawful for any interstate railroad carrier "to use any locomotive in moving interstate or foreign traffic" not equipped with an ash pan. Section 23 is the Boiler Inspection Act. Its language has already been several times quoted.

It will be noted that in not one of the absolute liability sections, except section 4, does the statute apply to cars or engines simply engaged in interstate commerce. In each section, except section 4, some further limitation appears. In some of the sections it is required, in addition, that the equipment be used in "moving interstate traffic." Others use language more comparable to that used in section 23. But with the exception of section 4 each of the sections in chapter 1 of title 45 U.S.C.A. clearly and without ambiguity indicates that it is to apply only when the car is in use on the line or in moving traffic. This, by necessary implication, excludes such sections when the equipment is removed from the line and placed in a roundhouse for temporary or more serious repairs.

For the foregoing reasons judgment is reversed. (See *Stetson* v. *Sheehan,* 186 Cal. 334 [200 P. 392].)

Knight, J., and Ward J., concurred.

A petition for a rehearing was denied August 18, 1945, and the opinion and judgment were modified to read as above. Respondent's petition for a hearing by the Supreme Court was denied October 15, 1945. Carter, J., voted for a hearing.