**Michael Dennis ESTES, Plaintiff-Appellant,**

v.

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant-Appellee.**

**No. 77–1762.**

United States Court of Appeals, Tenth Circuit.

Argued March 13, 1979.

Decided May 14, 1979.

Richard I. Ashton, Salt Lake City, Utah (Harold A. Hintze of Fox, Edwards & Gardiner, Salt Lake City, Utah, on brief), for plaintiff-appellant.

L. Ridd Larson, Salt Lake City, Utah (James W. Gilson of Ray, Quinney & Nebeker, Salt Lake City, Utah, on brief), for defendant-appellee.

---

Before McWILLIAMS and BARRETT, Circuit Judges, and MILLER, Judge.*

MILLER, Judge.

Appellant Michael D. Estes appeals from a judgment entered on a jury verdict in his favor under the Federal Employer's Liability Act (45 U.S.C. § 51 et seq.)[1] in the amount of $17,154[2] less $6,500 representing his contributory negligence; also from an order denying (1) his motion for an additur of at least $50,000 or, alternatively, for a new trial on damages alone or on all issues and (2) his motion for reinstatement of his Boiler Inspection Act claim to be applied to the case or to be submitted to the jury in a new trial. We affirm.

### Facts

On the night of January 5, 1975, Estes was performing his duties as an engine hostler[3] for appellee Southern Pacific Transportation Company in and about its "roundhouse" area at Ogden, Utah. He was assigned to move a locomotive unit located north of the pit on pit track 1, a service track where engines are fueled, sanded, and given light maintenance. He testified that the unit "was full of fuel." Units placed on a service track are on a two-hour call, meaning that "in theory" they can be serviced and placed back out on a main line within two hours. Seventy-five percent of the units entering the roundhouse do so only for fueling and servicing and go right out again for freight transportation. If major servicing is required, a unit is removed from the pit track by a hostler to a "back shop."

At the trial, Estes testified that he had "no idea" where he had been told to move the locomotive unit; that, from its location, it possibly could be moved out and tied into a run-through train, possibly waiting on the main line, or be moved back to pit 1, or be moved to pit 2, or be moved to a "search" area, or be moved to get some sand, or be moved to a "back shop," or be moved to the "truck shop" for a change of wheels. He could not recall the number of the locomotive unit.[4] However, the roundhouse foreman testified that locomotives not scheduled to be held for repair are placed on the service tracks.

Estes also testified that, after he boarded the unit, he walked along the catwalk to two steps going from the catwalk to the engine cab door; he put his right foot onto one of the steps and his right hand on the engine cab door handle; at the same time that he pushed down on the door handle (which "caught and pushed harder"), he turned to his left to look back over his shoulder to see whether the hand brake was released (so the unit could be moved); "and that's when I really felt it in my back." He described it as "a sharp pain through the lower part of my back, and it was very severe." He then left the locomotive unit and went to the change room where he laid down on a bench for the remainder of his shift, which ended an hour later at 10:00 P.M. He then drove to his home. Seven

---

* The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. Plaintiff's action was also brought under the Boiler Inspection Act (45 U.S.C. § 23) which does not provide for diminution of damages for contributory negligence because negligence is not an issue. *Lilly v. Grand Trunk Western R.R. Co.*, 317 U.S. 481, 491, 63 S.Ct. 347, 353, 87 L.Ed. 411, 418 (1943). However, the trial court directed a verdict against Estes on his Boiler Inspection Act claim.

2. This total coincides with Estes' claim for special damages of $13,000 for lost wages and $4,154 for medical expenses. The injury complained of was a herniated or ruptured disc.

3. A hostler is defined in *Webster's Third New International Dictionary* (1971) as "one who takes charge of a railroad locomotive after a run: one who moves and services locomotives in enginehouse or roundhouse territory." The "roundhouse" herein involved is not a building but an area of trackage, maintenance pits, shops, offices, and a turntable, where locomotives are inspected, serviced, maintained, and repaired.

4. Appellee points out that without knowledge of the unit number it could not be determined from its records where the unit was to be moved.

hours later he reported back to work, but was unable to perform his duties and "laid on the bench." He also filled out an accident report stating that the nature of the injury was "strained back" and describing how it occurred by stating "employee twisted while opening door to unit on engineer's side." Before filling out the report, he told the road foreman of engines, Lloyd Wright, that he "twisted at his waist while opening the door [on the locomotive unit] and felt he jerked a crick in his back." [5] Wright, in a deposition, stated:

Well, I asked him if he took any exception to the equipment or if the door was hard to open, and he said, "No."

(Four of Estes' coworkers, including Wright, testified that they had experienced difficulties in opening the cab doors on some of the engines.)

On January 7, Estes went to a chiropractor and told him that he had hurt his back doing some "lifting." [6] He received several treatments during the next week or so. Also, he told his wife that he had hurt his back and "had slipped or fallen." He continued to work until the last part of 1975, although, according to his testimony, he "had a lot of pain." He bowled (16 pound ball) from February until the last of April as a member of a bowling league and participated in a bowling tournament in Reno, Nevada. When the bowling league resumed after the summer, he continued bowling from September until the latter part of December. In October of 1975 he was involved in a jeep incident in which the jeep rolled over onto its side and he was "shook up a little bit"; in November of 1975 he went skiing at Powder Mountain.[7] He testified that he sustained no additional injuries to his back subsequent to the incident involving the locomotive unit on January 5, 1975.

Estes testified that in the latter part of December the pain "got so bad" he couldn't continue with his work. He first saw an orthopedic surgeon (Dr. Mattsson) on January 27, 1976, when he was hospitalized for a week.[8] His condition was diagnosed as a herniated disc. He was readmitted to the hospital shortly thereafter for another week for therapeutic treatments. In April he returned to the hospital and was operated on. He returned to work in July of 1976, but was placed under a restriction to not lift more than fifty pounds.

### OPINION

■ Appellant argues that the trial court erred in directing a verdict for appellee on appellant's Boiler Inspection Act claim. This act (45 U.S.C. § 23) provides:

It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time . . . and are able to with-

---

5. Plaintiff's expert witness, Dr. Carl Mattsson, an orthopedic surgeon, testified that "rotation at the waist to look behind you" would be just as likely to have caused a herniated disc as pushing down on a door handle. One of Estes' fellow-hostlers testified that Estes told him he had hurt himself attempting to open a cab door.

6. Dr. Mattsson testified that "lifting" is just as likely to have caused a herniated disc as attempting to open an engine cab door.

7. On cross-examination, Dr. Mattsson testified that such activities could have caused a herniated disc; that it was "definitely possible" Estes could have sustained a muscle strain on January 5 and, subsequently, something could have happened to him whereby he sustained a herniated disc. On direct examination, Dr. Mattsson had testified "The probability is very good that he ruptured a disc at that time [January 5, 1975]."

8. Following the chiropractic treatments, Estes saw a Dr. Keith Stratford at the Medical Dental Center in Ogden. He testified that "they took some X-rays, and he told me it was muscle spasms and gave me some pain pills." He next saw a Dr. Chauncey Michaelson on January 23, 1976, who called in Dr. Mattsson.

stand such test or tests as may be prescribed in the rules and regulations hereinafter provided for.

It is appellant's position that the phrase "used on its line" covers the locomotive unit involved here, citing *Texas & Pacific Railway Co. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). However, appellee argues that the statute involved in that case was section 4 of the Safety Appliance Act (45 U.S.C. § 4), which makes it unlawful to use any car "in interstate commerce" that is not provided with secure grab irons or handholds, and that section 4 is broader in application (albeit limited to grab irons or handholds) than section 23. A reading of the *Rigsby* opinion discloses that the Court, in interpreting the phrase "interstate commerce," was concerned with the power of Congress under the commerce clause of the Constitution "to require certain safety appliances to be installed upon railroad cars used upon a highway of interstate commerce, irrespective of the use made of any particular car at any particular time." *Id.* at 41, 36 S.Ct. at 485, 60 L.Ed. 878. The Court's decision that section 4 applied to a defective ladder on a box car in a switchyard is reenforced by section 13 of the Safety Appliance Act, which provides for "the sole risk of the carrier" for death or injury of any railroad employee when moving a car for repair of equipment (provided in accordance with sections 1 to 16) that has become defective.[9] It is significant that Congress did not amend section 13 so that it would also apply to the Boiler Inspection Act (section 23) when the latter was enacted in 1911.[10]

It is also significant that when Congress enacted the Boiler Inspection Act it employed the words "used on its line" rather than used "in interstate commerce" as had been done in section 4. That the different language was intentional is clearly shown by the House committee report on S. 6702, the bill that was eventually enacted. The purpose of the bill was stated as follows:[11]

> The bill now reported forbids the railroads from using locomotive engines . . . *in moving interstate or foreign traffic* unless the boilers and appurtenances thereof are in proper condition and safe to operate . . . . [Emphasis added.]

Thus, "used on its line" in the statute was intended to mean used in *moving* interstate or foreign traffic.

Appellant relies on *Lilly v. Grand Trunk Western Railroad Co., supra* at 486, 63 S.Ct. 347, 351, 87 L.Ed. 411, 415, for its statement that the Boiler Inspection Act is to be "liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment." However, in context, that statement had to do with the breadth of the safe equipment requirement of the Act—not the use of a locomotive unit at the time of an accident. The same is to be said of *Bolan v. Lehigh Valley Railroad Co.*, 167 F.2d 934 (2d Cir. 1948), also relied on by appellant. Appellant cites *International-Great Northern Railroad Co. v. United States*, 268 F.2d 409, 412 (5th Cir. 1959), for its statement that the "line of railroad" (in section 13)—

> should not be restricted to its right-of-way and trackage between terminals but comprehends spurs, sidings and yards.

However, as noted above, section 13 does not apply to the Boiler Inspection Act.

Accordingly, we hold that, at the time of the incident which is the subject of appellant's action, the locomotive unit was not engaged in moving interstate or foreign traffic and was not, therefore, in use on appellee's line for purposes of the Boiler

9. The House committee report accompanying the bill that amended section 13 in 1910 states:

> In removing the penalty for the hauling of such a defective car, when necessary, to a repair shop, it is intended by the terms of the proviso to preserve intact and unimpaired all the rights now existing by law to the train man, or his representative, to recover in case of injury or death resulting from the peril of

participating in the movement of such a defective car.

H.R.Rep.No.37, 61st Cong., 2d Sess. 4 (1910).

10. Act of February 17, 1911, Pub.L.No.383, § 2, 36 Stat. 913.

11. H.R.Rep.No.1974, 61st Cong., 3d Sess. 3 (1911).

Inspection Act. *See Tisneros v. Chicago & North Western Railway Co.,* 197 F.2d 466 (7th Cir. 1952) (engine had ended its service run and was in a stall in the roundhouse); *Lyle v. Atchison, Topeka & Santa Fe Railway Co.,* 177 F.2d 221 (7th Cir. 1949) (hostler had moved engine to inspection pit at roundhouse for service); *Compton v. Southern Pacific Co.,* 161 P.2d 40 (Cal.Dist.Ct. App.1945) (engine in roundhouse for inspection, service, and repair).

With respect to appellant's motion for an additur, this was properly denied by the trial court. Although appellant states he had agreed to accept an additur and to waive his motion for a new trial, this overlooks appellee's Seventh Amendment right, free from reexamination in the form of a judge-set additur, to have a jury determine the damages. *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Novak v. Gramm,* 469 F.2d 430 (8th Cir. 1972); 11 Wright & Miller, *Federal Practice and Procedure* § 2816 (1973); 6A *Moore's Federal Practice,* ¶ 59.05[4] (1978).

As to appellant's motion for a new trial on damages alone or on all issues, this was grounded primarily on appellant's argument that the coincidence in the amount awarded by the jury ($17,154 before reduction for contributory negligence) and the amount claimed for lost wages ($13,000) plus medical expenses ($4,154) shows that the jury improperly refused to award any general damages for pain and suffering and permanent disability. Although the trial court recognized that such a coincidence "has some persuasive value," it said:

> [T]here is evidence which would support a finding by the jury that the negligence of the defendant did not occasion all of the wage loss, medical expense, pain, suffering, and disability claimed to be associated with the plaintiff's back problem. As the defendant argues, the evidence of mishaps subsequent to the incident complained of by the plaintiff could well have

led the jury to conclude that defendant's negligence only gave rise to a back sprain and not to the herniated disc which apparently is the cause of a substantial portion of the damage alleged by the plaintiff. In conclusion it is the opinion of this court that the $17,154 award is not necessarily a clear indication of a failure on the part of the jury to award general damages. Under the facts of this case, it is entirely possible and plausible to conclude that that amount represents the jury's estimate of both the special and general damages suffered by the plaintiff. The court can find no evidence of passion, bias or prejudice which would justify the granting of a new trial on the issue of damages.[12]

Appellant relies heavily on *Brown v. Richard H. Wacholz, Inc.,* 467 F.2d 18 (10th Cir. 1972), in which this court held there was a manifest abuse of discretion on the part of the trial court in failing to grant a new trial on the issue of damages (for a broken right femur), where the jury awarded the plaintiff $1,705—the exact amount of plaintiff's medical and hospital outlay. The court said: "Thus, on its face it establishes that the jury failed and refused to award compensation for pain and suffering and permanent disability." However, the trial court here distinguished the *Brown* case by pointing out that the medical expenses introduced into evidence in that case "could only have been the result of the defendant's negligent act." To this appellant responds that the defendant in *Brown* could have argued that only a portion of the medical expenses had been awarded by the jury on account of defendant's negligence (the balance being attributable to a preexisting poliomyelitis condition) and that, therefore, the award represented a substantial amount of general damages. Considering the small amount of the award, we can only speculate that such an argument probably would not have been effective.

---

**12.** Bias, prejudice, or passion may be inferred from an award that is "so excessive or inadequate as to shock the judicial conscience," in which event the trial court's refusal to grant a

new trial would be an abuse of discretion. *Barnes v. Smith,* 305 F.2d 226, 228 (10th Cir. 1962).

The trial court emphasized that *under the facts of this case* it is "entirely possible and plausible to conclude that the amount represents the jury's estimate of both the special and general damages suffered by the plaintiff." We agree. There is substantial evidence from which the jury could have concluded that appellant's injury on the locomotive unit was only a back sprain and, indeed, that it occurred from twisting at the waist, or from lifting, or from falling, rather than from pushing down on a door handle that was negligently maintained. There also is substantial evidence from which the jury could have concluded that appellant's herniated disc was caused by his bowling or other incidents related earlier in this opinion. Although not as large as plaintiff had hoped for, the amount of the award was large enough to permit a substantial allocation for general damages. *See Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782, 785–86 (1st Cir. 1974). The fact that the award of $17,154 is an odd-dollar amount could, for example, represent a reduction by the jury of $10,000 in lost wages and medical expenses which it found were not attributable to the January 5, 1975, incident, and an addition of $10,000 for general damages. Moreover, we do not regard the jury's award as so inadequate as to be "shocking." *Barnes v. Smith, supra.*

In view of the foregoing, we hold that it was not a manifest abuse of discretion for the trial court not to order a new trial.[13]

The judgment and order are affirmed.

---

13. In view of our holding, it is unnecessary to reach appellee's argument that appellant waived his right to object to the form of the jury's verdict by failing to request that the jury be sent out for further deliberations to return a proper verdict.