Kenneth HORIBIN, Plaintiff,

v.

**PROVIDENCE & WORCESTER RAILROAD COMPANY,
Defendant.**

Civil Action No. 03–40013–FDS.

United States District Court,
D. Massachusetts.

Jan. 6, 2005.

Robert T. Naumes, Kristen Marquis Fritz, Robert M. Byrne, Jr., Thornton & Naumes, LLP, Boston, MA, for Plaintiff.

Brian C. Newberry, Howard E. Walker, Jason B. Daly, Hinckley, Allen & Snyder, Providence, RI, Michael B. Flynn, Richard A. Davidson, Jr., Flynn & Associates, PC, Quincy, MA, for Defendant.

## MEMORANDUM & ORDER

SAYLOR, District Judge.

On January 16, 2003, plaintiff Kenneth Horibin instituted this action against defendant Providence & Worcester Railroad Company ("P & W"), seeking compensation under the Federal Employers' Liability Act, 45 U.S.C. § 51, et seq. ("FELA") for an injury he allegedly suffered while working as a locomotive engineer for P & W.[1] Horibin contends that he injured his

lower back due to a malfunction in a locomotive hand brake, and that the malfunction resulted from P & W's failure to inspect and lubricate the brake chain. He advances several grounds for liability under the FELA, alleging that defendant is (1) strictly liable for violating the Federal Locomotive Inspection Act, 49 U.S.C. §§ 20701–20703 ("FLIA"); (2) strictly liable for violating the Federal Safety Appliance Act, 49 U.S.C. §§ 20301–20306 ("FSAA"); and (3) liable for negligence.[2]

Pending before the Court is plaintiff's motion for partial summary judgment as to the FLIA claim. Pursuant to Fed. R.Civ.P. Rule 56, Horibin requests that the Court enter a judgment that the FLIA applies to this case, as a matter of law, because the locomotive on which he was injured was "in use" within the meaning of the statute.[3]

### Factual Background

P & W hired Horibin to work in its Transportation Department on June 24, 1982. In the course of his eighteen-year tenure with the company, Horibin served at various times as a conductor, brakeman, and locomotive engineer.

On March 13, 2000, Horibin served as the engineer of a train assigned to travel from Worcester, Massachusetts, to the

---

1. The parties stipulate that Horibin is entitled to bring suit under the FELA because P & W is a common carrier by railroad, the parties were engaged in interstate commerce at the time and place of Horibin's alleged injury, and Horibin was performing his duties as a P & W locomotive engineer at the time and place of the alleged injury. *See* 45 U.S.C. § 51.

2. The FELA affords employees of common carriers a cause of action for work-related injuries suffered as a result of their employer's negligence. 45 U.S.C. § 51. The FLIA and the FSAA "are substantively if not in form amendments to the [FELA]. They dis-

pense ... with the necessity of proving ... negligence ... in certain classes of [FELA] suits." *Urie v. Thompson*, 337 U.S. 163, 188–190, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Thus, employers are strictly liable for injuries resulting from violations of the FLIA and FSAA. *See id.*

3. Horibin's motion and complaint actually refer to the Federal Boiler Inspection Act, 45 U.S.C. § 23 ("FBIA"). However, as P & W notes, the FBIA was recodified in 1994 without substantive change under the title Federal Locomotive Inspection Act. *See* Pub.L. 103–272, § 1(a), July 5, 1994, 108 Stat. 85.

Valley Falls railroad yard in Cumberland, Rhode Island, servicing customers along the way. Horibin completed this assignment, arriving at the Valley Falls railroad yard at approximately 3:00 A.M. the following day. Robert Gibbons, the conductor of the train, accompanied Horibin on the trip.

Once Horibin entered the railroad yard, he switched the train from main line tracks onto yard tracks and came to a stop. At that point, the train's freight cars were decoupled from the locomotive. Horibin then switched the locomotive from the yard tracks to the storage tracks and proceeded to the Valley Falls Engine House.

The Engine House is used to store locomotives while they await future use.[4] It has no mechanical department to repair, service, or maintain locomotives; maintenance and repair of P & W locomotives is performed in Worcester.

Horibin parked the locomotive inside the Engine House, deactivated its engines, disconnected its electric generator, turned off its interior and exterior lights, physically removed the handles necessary to operate the locomotive's brakes and throttle, and set the automatic brakes. He then attempted to set the locomotive's hand brake.

P & W employees are required to follow the Northeast Operating Rules Advisory Committee Operating Rules ("NORAC Operating Rules") and the Providence and Worcester Railroad Company Air Brake and Train Handling Rules ("P & W Rules"). Both rules required Horibin, as the engineer, to set the hand brake before leaving the locomotive. The hand brake is operated by moving a handle that ratchets a chain over a sprocket drive; the motion of the handle applies tension to the chain, which in turn pulls the brakes into tight contact with a set of the locomotive's wheels.

Horibin alleges that, while he was setting the hand brake, the handle unexpectedly rotated freely, causing him to lose his balance, fall forward against the nose of the locomotive, and twist his back. Horibin states that he felt an immediate onset of acute back pain.

There were no witnesses to Horibin's alleged injury; Gibbons was in the office doing paperwork at the time. Horibin filed a report documenting the incident on March 14.

Horibin instituted the present action against P & W on January 16, 2003. On December 8, 2004, he filed the pending motion for partial summary judgment.

### Analysis

#### I. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue.

---

4. Ordinarily, the locomotive operated by Horibin would have been parked in the Engine House until 7:30 A.M. or 9:30 A.M. on March 14, at which point another engineer would have taken it back out to the yard tracks, where it would have been coupled to freight cars and taken back to Worcester. The record does not disclose whether this course of action was followed with respect to the locomotive in question.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## II. *Applicability of the FLIA*

 The FLIA imposes strict liability on railroad carriers for violations of its safety standards. *See Urie,* 337 U.S. at 188–190, 69 S.Ct. 1018. The Act provides in pertinent part:

A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.

 Absolute liability under the FLIA does not attach unless the locomotive in question was "in use" at the time of the employee's alleged injuries. *McGrath v. Consolidated Rail Corp.,* 136 F.3d 838, 842 (1st Cir.1998) (FBIA).[5] The purpose

of the "in use" limitation is to give railroads the opportunity to inspect for and correct defective conditions before being exposed to strict liability. *Angell v. Chesapeake and Ohio Railway Co.,* 618 F.2d 260, 262 (4th Cir.1980) (FBIA); *Phillips,* 190 F.3d at 288. Thus, "[c]ongressional intent and the case law construing the statute clearly exclude those injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility." *Angell,* 618 F.2d at 262.

Determining whether a locomotive is "in use" is not always the "fairly straightforward exercise" that one would expect. *See Deans v. CSX Transportation, Inc.,* 152 F.3d 326, 329 (4th Cir.1998) (FSAA). Obviously, a locomotive pulling a train on a main line from one city to another is "in use," and a locomotive that is in storage or in a repair shop for servicing is not "in use." *See Pinkham v. Maine Central R.R. Co.,* 874 F.2d 875, 881 (1st Cir.1989) (FBIA); *McGrath,* 136 F.3d at 842; *Phillips,* 190 F.3d at 288. The difficulty arises principally when a locomotive is in transition from one status to another. Locomotives (and trains) must be both prepared for departure and attended to upon arrival, and there is no bright line separating "use" from "non-use"—that is, repair, maintenance, servicing, switching, and other activities that are intended to be excluded from the statutory definition. *See Deans,* 152 F.3d at 330 (discussing "the multitude of steps required—and various sequences in which these steps may be taken—to prepare a train for departure"). It is thus possible for a locomotive to be "in use" even though it is motionless and

---

5. The "in use" requirement of the former FBIA was substantially similar to that set forth in the FLIA. *See* 45 U.S.C. § 23. The FSAA also contains functionally equivalent "in use" language. *See Phillips v. CSX Transportation, Inc.,* 190 F.3d 285, 288 n. 2 (4th

Cir.1999) (applying case law interpreting the FBIA to an FSAA claim because the two statutes contain identical "in use" language). This opinion will therefore refer to decisions rendered under the FBIA and the FSAA.

not on a main track. *McGrath,* 136 F.3d at 842; *Brady v. Terminal R.R. Ass'n of St. Louis,* 303 U.S. 10, 13, 58 S.Ct. 426, 82 L.Ed. 614 (1938) (FSAA).

██ In the First Circuit, the two "determinative factors" for determining whether a locomotive is "in use" are (1) the activity of the plaintiff at the time of the injury, and (2) the location of the locomotive at the time of the injury. *McGrath,* 136 F.3d at 842; *Pinkham,* 874 F.2d at 882. "Whether a locomotive is 'in use' under the Act is 'a question of law for the trial court to decide and not a question of fact for the jury.'" *McGrath,* 136 F.3d at 842 (quoting *Pinkham,* 874 F.2d at 881).

There are a number of reported cases involving injuries occurring prior to the departure of a train, while it was in transition from "non-use" to "use," not all of which are completely consistent. *Compare, e.g., McGrath,* 136 F.3d at 838 (in use; employee was engineer performing inspection duties prior to departure, injured while beginning inspection); *Angell,* 618 F.2d at 260 (in use; employee was machinist assisting in assembly of train for departure, injured while uncoupling air brakes); *Deans,* 152 F.3d at 326 (in use; employee was conductor coupling locomotives to train for departure and testing brakes, injured while releasing hand brakes); *with Trinidad v. Southern Pacific Trans. Co.,* 949 F.2d 187 (5th Cir.1991) (not in use; plaintiff was carman responsible for testing brakes prior to departure, injured while attempting to notify engineer of a problem); *Phillips,* 190 F.3d at 289–90 (not in use; plaintiff was member of yard crew responsible for switching operations, injured while setting brakes prior to pre-departure inspection of assembled train).

In *McGrath,* the locomotive at issue was idling on a yard track used to store, inspect, classify, and switch locomotives and railroad cars. *Id.* Plaintiff, the engineer, allegedly sustained an injury after boarding the locomotive and walking toward the daily inspection card, which he was required to consult prior to moving the locomotive. *Id.* Applying the two determinative factors, the First Circuit held that the injury was actionable under the FLIA. *Id.* Plaintiff sustained the injury in the course of performing duties "'incidental to [the] task of operating the train as an engineer,'" rather than in the course of maintenance work, and the locomotive's location-the yard track-was not a place of repair. *Id.* (quoting *Rivera v. Union Pacific Railroad Co.,* 868 F.Supp. 294, 301 (D.Col.1994)).

Similarly, in *Deans,* a case analogous to the action at bar, the court held that an injury allegedly suffered by a conductor while releasing a locomotive's hand brake before departure was covered by the FLIA. 152 F.3d at 330. The locomotive was "in use" at the time of the injury because the injured employee was a member of the transportation crew, in the process of releasing the hand brakes to put the train in motion. *Id.*[6] In addition, the train was located "on a track in the rail yard in preparation for imminent departure" and was "close[ ] to actual motion." *Id.*

██ The present case is somewhat different in that it involves the handling of a locomotive after arrival, rather than prior to departure. Nonetheless, there are substantial similarities. When a train crew reaches the end of its journey, it cannot simply abandon the train and walk away; it must engage in certain activities in order to "park" the locomotive safely. Those activities may vary by locomotive, by rail-

---

6. The fact that the conductor had yet to complete a pre-departure air brake test when the injury occurred was not dispositive of the question of whether the train was "in use." *Id.*

road, or by employee job responsibility, but clearly there is some set of activities in each case that represent the end of "use" and the beginning of storage, switching, or repair. Here, the application of the two factors dictate that the locomotive in question was still "in use" at the time of Horibin's alleged injury.

As to the first factor, there is no dispute that Horibin was acting as a locomotive engineer at the time of his injury. He was a member of the Transportation Department and was not responsible for maintenance or repair. See Deans, 152 F.3d at 329; McGrath, 136 F.3d at 842; compare Phillips, 190 F.3d at 290; Pinkham, 874 F.2d at 881. He sustained the alleged injury while performing a duty (setting the hand brake) that was required of an engineer by the P & W Rules and NORAC Operating Rules. That activity was thus " 'incidental to [the] task ' " McGrath, 136 F.3d at 842 (quoting Rivera, 868 F.Supp. at 301).

Moreover, although movement of the locomotive was in the immediate past rather than the imminent future, the locomotive was nonetheless "close[ ] to motion" when Horibin attempted to set the hand brake. See Deans, 152 F.3d at 330; see also Angell, 618 F.2d at 262 (finding train "in use" where employee was injured as he was moving an engine in order to coupled to a train to be moved a few hours later). The setting of the hand brake, like shutting off the engine and turning off the lights, was an integral and necessary part of the process by which the engineer shut down the locomotive and took it out of "use." [7]

As to the second factor, it appears that the Valley Falls Engine House, where the injury occurred, is simply a storage shed where the locomotive would be parked temporarily prior to its return to Worcester. The Engine House did not serve as a maintenance facility for repair, inspection, or servicing of locomotives.

P & W directs the Court's attention to several cases in which locomotives located inside of storage facilities were found not to be "in use." See Tisneros v. Chicago & N.W. Ry. Co., 197 F.2d 466, 467 (7th Cir. 1952); Lyle v. Atchison, 177 F.2d 221, 222–223 (7th Cir.1949); Baltimore & O.R. Co., v. Hooven, 297 F. 919, 922–923 (6th Cir. 1924); Simpkins v. Baltimore & O. R.R. Co., 449 F.Supp. 613, 616 (S.D.Ohio 1976). However, in each case cited, employees responsible for transportation turned the locomotive over to a maintenance or repair crew, and a member of that crew thereafter sustained an injury while servicing the locomotive. See Tisneros, 197 F.2d at 466–467 ("The engineer had left … Plaintiff then started to perform his duty," which was to "build[ ] up and maintain[ ] the fire, to have it in condition for future use …"); Lyle, 177 F.2d at 222–223 (the locomotive's operator "had turned it over to the round-house employees, [who] turned it over to plaintiff whose duty it was to make the service and to prepare the engine for future further use"); Hooven, 297 F. at 922–923 (locomotive was "withdrawn from service and at rest in a stall of the railroad's roundhouse undergoing repairs …"); Simpkins, 449 F.Supp. at 616

---

7. By way of analogy, an automobile may be said to be in "use" until the operator has taken all steps incidental to shutting down the vehicle: e.g., stopping it, putting the transmission in "park," turning off the ignition, turning off the lights, setting the brake, exiting, and locking the doors. Some of those steps may be different for different vehicles (e.g., automatic v. manual transmissions), or at different times (e.g., day v. night), and some may be optional (e.g., locking the doors), but all of them are part of the process of taking an automobile out of "use." It is noteworthy here that under the relevant operating rules the setting of the hand brake was necessary, not merely optional or incidental, to shutting down the locomotive.

(locomotive was located on a "track devoted primarily to maintenance, inspection and repair activities and all the plaintiffs were engaged in servicing the engine when their respective mishaps occurred"). The presence of the locomotive in a storage facility was incidental to, rather than dispositive, of the outcome.

Here, the plaintiff was a member of the transportation crew, with no maintenance or repair duties, and there is no evidence that repair or maintenance ever occurred inside the Engine House. Horibin had to park the locomotive *somewhere* at the close of his run. Under the circumstances, it is immaterial that he did so in the Engine House, as opposed to the yard, a siding, or indeed the main line.[8]

Accordingly, the Court concludes that the locomotive in question was "in use" at the time of the alleged injury, and therefore P & W is strictly liable for injuries suffered as a result of any violation of the FLIA.

### Order

For the reasons stated in the foregoing memorandum, plaintiff's motion for partial summary judgment under Fed.R.Civ.P. 56 is GRANTED.

**So Ordered.**

---

**8.** To return to the automobile analogy, the automobile remains in "use" until it is shut down, whether or not it is parked on the street, in the driveway, or in the garage.