[No. A113752. First Dist., Div. Four. Dec. 21, 2007.]

IOLA FRASTACI et al., Plaintiffs and Appellants, v.
VAPOR CORPORATION, Defendant and Respondent.

**COUNSEL**

Law Office of Ted W. Pelletier, Ted W. Pelletier; Harowitz & Tigerman, Steven M. Harowitz and Stephen M. Tigerman for Plaintiffs and Appellants.

Oium Reyen & Pryor, Keith Reyen, Bret R. Landess; Baker & Lancianese and Jon Orndorff for Defendant and Respondent.

OPINION

REARDON, J.—

## I. INTRODUCTION

In this appeal, the survivors of a railroad worker seek to overturn a judgment dismissing their state tort claims against locomotive manufacturer Vapor Corporation (Vapor) for asbestos-related injuries. The dismissal followed the trial court's sustaining Vapor's demurrer without leave to amend, on the grounds of federal preemption under the Locomotive Boiler Inspection Act (49 U.S.C. § 20701 et seq.; hereafter BIA), as discussed in *Scheiding v. General Motors Corp.* (2000) 22 Cal.4th 471 [93 Cal.Rptr.2d 342, 993 P.2d 996], certiorori denied (2000) 531 U.S. 958 (*Scheiding*).

In *Scheiding, supra*, 22 Cal.4th at pages 473–474, 477, the California Supreme Court, relying on the seminal case of *Napier v. Atlantic Coast Line* (1926) 272 U.S. 605, 611 [71 L.Ed. 432, 47 S.Ct. 207] (*Napier*), held the BIA preempts railroad employees' state law actions against manufacturers of locomotives containing asbestos materials, because Congress intended the federal government to occupy the field of locomotive safety, including the " 'design, the construction, and the material of every part of the locomotive and tender and of all appurtenances.' (*Napier*[, *supra*,] 272 U.S. [at p.] 611 . . . .)" (*Scheiding, supra*, 22 Cal.4th at p. 474.) Plaintiffs maintain that *Scheiding* is not dispositive authority in the instant case because it did not address the preemptive scope of the BIA with respect to asbestos exposure occurring during repairs, when the trains are not "in use."

We conclude *Scheiding* forecloses state tort claims against locomotive manufacturers for defective design of their product, regardless of whether a locomotive is "in use" or off line in roundhouses or repair shops. Accordingly, we affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Decedent Enio Frastaci worked as a locomotive repairman for the Wheeling and Lake Erie Railroad from 1946 through 1948. His father worked as a boilerman and a lineman for the Nickel Plate Railroad, the predecessor of the Wheeling and Lake Erie Railroad, from approximately 1915 to 1960. At some point, decedent was diagnosed with mesothelioma, an asbestos-caused cancer of the outer lung lining. He died of the disease on September 29, 2004. On March 28, 2005, decedent's wife and children brought a wrongful death and survival action against numerous defendants, seeking compensation

for his asbestos injuries and his wife's loss of consortium, as well as punitive damages. Plaintiffs allege that decedent sustained both direct and secondary exposure to asbestos.

The complaint categorizes defendants in two classes: (1) "manufacturing/distributing defendants," which made or distributed the asbestos-containing products; and (2) "premises defendants," which include various railroad companies that controlled the property where decedent and/or his father was exposed to asbestos-containing products. The complaint alleges various causes of action against Vapor, including negligence, strict liability, and false representation. Additionally, the complaint alleges causes of action against the railroad companies for violations of the Federal Employers' Liability Act (45 U.S.C. § 51 et seq.; hereafter FELA) and the BIA.

Vapor filed a demurrer to the complaint on the grounds that the BIA preempted the state tort claims and that the complaint failed to identify any product attributable to Vapor. After several rounds of supplemental briefing and multiple hearings, the trial court sustained the demurrer without leave to amend, on preemption grounds. The trial court denied plaintiffs' motion for a new trial and this appeal followed.

### III. DISCUSSION

#### A. Preemption Principles

One of the primary goals of preemption is uniformity. The supremacy clause (U.S. Const., art. VI, § 2) empowers Congress to create uniform national rules by supplanting state regulation. The doctrine of federal preemption is designed to prevent states from impinging on federal law and policy. (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608]; *Law v. General Motors Corp.* (9th Cir. 1997) 114 F.3d 908, 909 (*Law*).)

Federal preemption "fundamentally is a question of congressional intent." (*English v. General Electric Co.* (1990) 496 U.S. 72, 78–79 [110 L.Ed.2d 65, 110 S.Ct. 2270].) "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' [Citation.] In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, [citation], or if federal law so thoroughly occupies a legislative field ' "as to make reasonable the inference that Congress left no room for the States to supplement it." ' [Citation.]" (*Cipollone v. Liggett Group, Inc., supra*, 505 U.S. at p. 516.) Federal statutes that occupy a field serve to preempt both state statutory enactments and state common law torts remedies, as a damages award can act as a "potent method

of governing conduct and controlling policy." (*San Diego Unions v. Garmon* (1959) 359 U.S. 236, 247 [3 L.Ed.2d 775, 79 S.Ct. 773].)

■ "Given the importance of federalism in our constitutional structure, however, we entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects—like health and safety—'traditionally governed' by the states. *CSX Transp., Inc. v. Easterwood* [(1993)] 507 U.S. 658, 664 [123 L.Ed.2d 387, 113 S.Ct. 1732]. 'Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." ' *Id.* (quoting *Rice v. Santa Fe Elevator Corp.* [(1947)] 331 U.S. 218, 230 [91 L.Ed. 1447, 67 S.Ct. 1146])." (*Law, supra*, 114 F.3d at pp. 909–910.)

■ "It has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety, particularly as it relates to injuries suffered by railroad workers in the course of their employment." (*Law, supra*, 114 F.3d at p. 910.)

B. *The BIA and FELA*

■ The FELA holds railroad employers liable for the injury or death of railroad employees that results, in whole or in part, from the railroad's negligence or that of its agents. (45 U.S.C. § 51; *Crane v. Cedar Rapids & I. C. R. Co.* (1969) 395 U.S. 164, 166 [23 L.Ed.2d 176, 89 S.Ct. 1706].) Enacted in 1911, the BIA, together with the related Safety Appliance Acts (49 U.S.C. § 20301 et seq.; hereafter SAA),[1] are regarded as amendments to the FELA (*Urie v. Thompson* (1949) 337 U.S. 163, 189 [93 L.Ed. 1282, 69 S.Ct. 1018]; *Fontaine v. National R.R. Passenger Corp.* (1997) 54 Cal.App.4th 1519, 1525 [63 Cal.Rptr.2d 644] (*Fontaine*)). " 'The BIA supplements the FELA to provide additional public protection and facilitate employee recovery. [Citations.] The BIA is to be considered together with other federal railroad safety laws, and is to be construed liberally to carry out their remedial and humanitarian purposes. [Citation.] [¶] The FELA and the BIA further their humanitarian goals by imposing different types of liability. Liability under the FELA is premised on the railroad's negligence, however small. [Citations.]' " (*Fontaine, supra*, 54 Cal.App.4th at p. 1525, quoting *King v. Southern Pacific Transp. Co.* (10th Cir. 1988) 855 F.2d 1485, 1488, fn. 1.) In contrast, the BIA imposes an "absolute duty" on railroad carriers to ensure their locomotives are properly maintained and safe to operate.

---

[1] The SAA "constitutes a series of measures enacted between 1893 and 1910 intended to standardize regulations relating to freight-railcar safety devices for the benefit of workers and passengers. [Citation.]" (*Carrillo v. ACF Industries, Inc.* (1999) 20 Cal.4th 1158, 1162 [86 Cal.Rptr.2d 832, 980 P.2d 386].)

(*Fontaine, supra*, 54 Cal.App.4th at p. 1525; see *Matson v. Burlington Northern Santa Fe R.R.* (10th Cir. 2001) 240 F.3d 1233, 1235.)

■ " 'The FELA allows recovery in a broad range of situations, while liability under the BIA only occurs under narrow circumstances. . . .' [Citation.]" (*Fontaine, supra*, 54 Cal.App.4th at p. 1525.) Specifically, the BIA states: "A railroad carrier *may use or allow to be used* a locomotive or tender *on its railroad line* only when the locomotive or tender and its parts and appurtenances—[¶] (1) are in proper condition and safe to operate without unnecessary danger of personal injury; [¶] (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and [¶] (3) can withstand every test prescribed by the Secretary under this chapter." (49 U.S.C. § 20701, italics added.)[2] A rail carrier can therefore be held liable under the BIA by either: (1) failing to keep its locomotives and appurtenances in proper condition and safe to operate without unnecessary peril to life and limb; or (2) violating a Federal Railroad Administration (FRA) regulation. (See *McGinn v. Burlington Northern R. Co.* (7th Cir. 1996) 102 F.3d 295, 297, 299.) However, claims that cannot be maintained under the BIA are often actionable under the FELA. (*Fontaine, supra*, 54 Cal.App.4th at p. 1525.)

C. *The BIA Preempts Plaintiffs' State Tort Claims*

■ Over 80 years ago, the United States Supreme Court, in *Napier, supra*, 272 U.S. 605, specifically addressed the scope and effect of the BIA, concluding it occupies the field of locomotive equipment, preempting all state claims within that field (272 U.S. at pp. 606–607, 612–613). *Napier* involved challenges to two state statutes that required all trains operating in the state to have an automatic fire door and a locomotive cab curtain. (*Id.* at p. 607.) The Supreme Court invalidated the statutes, holding that the BIA precluded states from imposing additional requirements for locomotive equipment. (*Napier, supra*, at p. 613.) In so holding, the court noted that Congress had not legislated, nor had the Interstate Commerce Commission (ICC), which had been given the power to regulate " 'the entire locomotive and tender and all parts and appurtenances thereof' " (*id.* at p. 608), made any order requiring either a particular type of fire door or cab curtain (*id.* at p. 609). The court further acknowledged that "[e]ach device was prescribed by the State primarily to promote the health and comfort of engineers and firemen" and therefore was "a proper exercise of its police power . . . ." (*Id.* at p. 610.) Nevertheless, the court reasoned that "the power delegated to the [ICC] by the [BIA] as amended is a general one. It extends to the design, the construction and the

---

[2] The SAA provides in part that "a railroad carrier may use or allow to be used on any of its railroad lines," vehicles and trains, provided they are equipped with certain safety devices. (49 U.S.C. § 20302.)

material of every part of the locomotive and tender and of all appurtenances." (*Id.* at p. 611.) *"The federal and the state statutes are directed to the same subject—the equipment of locomotives. They operate upon the same object.* . . . The fact that the [ICC] has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the Act delegating the power." (*Id.* at pp. 612–613, italics added.)

Given the broad scope of the authority conferred upon the ICC to regulate the design, construction, and material of every part of the locomotive, the *Napier* court concluded the BIA was intended to occupy the field and preempted the state laws. (*Napier, supra,* 272 U.S. at pp. 607, 613.)

The Ninth Circuit in *Law, supra,* 114 F.3d 908, relying on *Napier, supra,* 272 U.S. 605, articulated the reason for the BIA's broad preemptive reach. "This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation 'is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state.' [Citations.]" (*Law, supra,* at p. 910.)

*Law* rejected the distinction that the BIA speaks to railroad carriers and not to manufacturers. (*Law, supra,* 114 F.3d at p. 911.) The court reasoned that imposition of tort liability on manufacturers would "affect 'the design, the construction, and the material' of locomotives . . . by forcing them to conform to design and construction standards imposed by the states." (*Ibid.*)

*Law* also rejected the contention that railroad workers would be without a remedy for their injuries were manufacturers held not liable for design defects. (*Law, supra,* 114 F.3d at p. 912.) The FELA "allows railroad workers to recover against their *employers* for all occupational injuries . . . . This remedy is strong medicine. FELA authorizes recovery of compensatory damages—including pain and suffering—when the employer's 'negligence played any part, even the slightest, in producing the injury.' [Citation.]" (*Ibid.,* italics added.) The unavailability of punitive damages under the FELA does not permit states to supplement this " 'exclusive remedy.' [Citations.]" (*Laws, supra,* at p. 912.) *Law* further explains that disallowing tort actions against manufacturers would not decrease incentives on manufacturers to design and produce safe products as locomotive manufacturers already have every incentive to comply with federal standards. (*Ibid.*)

In *Scheiding, supra,* 22 Cal.4th 471, the California Supreme Court confirmed that the foregoing principles govern the viability of state law causes of

action against locomotive manufacturers for the defective design of products containing asbestos. (*Id.* at p. 476.) In affirming the judgment in favor of a defendant manufacturer on grounds of federal preemption, the Supreme Court quoted with approval the appellate court's reasoning: " 'There is no doubt that the Secretary of Transportation has authority to regulate the design of the locomotive and could order the elimination of asbestos in locomotive components. Imposing tort liability on railroad locomotive manufacturers clearly would affect " 'the design, the construction, and the material' of locomotives." ([*Law, supra,* 114 F.3d at p. 911, quoting *Napier, supra,* 272 U.S. at p. 611 . . .].) This effect on interstate commerce would be both "direct and substantial." (*English v. General Electric Co.*[, *supra,*] 496 U.S. [at p.] 85 . . . .) As *Law* explains, the imposition of tort liability on railroad equipment manufacturers would force them to conform to design and construction standards imposed by the states. "This would transfer the regulatory locus from the Secretary of Transportation to the state courts—a result the BIA was clearly intended to foreclose. [Citation.]" (*Law, supra,* at pp. 911–912, fn. omitted.)' " (*Scheiding, supra,* 22 Cal.4th at pp. 476–477, fn. omitted.)[3]

In discussing the continued vitality of *Napier* as the controlling and dispositive authority on the preemptive scope of the BIA, *Scheiding* explains, "[T]he BIA cannot remove 'the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances' from the purview of state regulation (*Napier, supra,* 272 U.S. at p. 611 . . .) without concomitantly precluding tort actions premised on a defect in such design, construction, or material. Any other result would place regulation of these requirements in the hands of state juries, thereby constraining the Secretary of Transportation's regulatory authority and undermining the goal of uniformity. [Citations.]" (*Scheiding, supra,* 22 Cal.4th at p. 480.)

Questioning the premise that railroad workers' health and safety are primarily concerns within the historic police powers of the state, *Scheiding* declined to find the presumption against preemption applicable to the plaintiffs' claims. (*Scheiding, supra,* 22 Cal.4th at p. 481.) The court reasoned:

---

[3] As noted in *Scheiding*: "It appears the [FRA] has, in fact, addressed the question of asbestos in locomotives. In a 1996 report to Congress, the FRA noted that the two primary builders . . . had 10 years earlier ceased to use friable asbestos and were 'careful to avoid the use of asbestos in new and rebuilt locomotives.' (FRA, U.S. Dept. of Transportation, Rep. to Congress, Locomotive Crashworthiness and Cab Working Conditions (Sept. 1996) p. 12-9.) Moreover, the FRA 'could find no evidence of asbestos being a health problem for crews of older locomotives.' (*Ibid.*) It determined that final regulations to protect workers from exposure to asbestos published by the Occupational Safety and Health Administration were sufficient to 'ensure effective long-term management of asbestos.' (*Id.* at p. 10-11.) Accordingly, it 'recommend[ed] no action be taken on the issue of asbestos in locomotives, except to the extent any new information requires that the issue be reopened.' (*Id.* at p. 12-9.)" (*Scheiding, supra,* 22 Cal.4th at pp. 476–477, fn. 2.)

" 'Railroads have been subject to comprehensive federal regulation for nearly a century. . . . There is no comparable history of longstanding state regulation . . . of the railroad industry.' (*Transportation Union v. Long Island R. Co.* (1982) 455 U.S. 678, 687–688 [71 L.Ed.2d 547, 102 S.Ct. 1349], fns. omitted.) . . . The statutory scheme, as construed by the courts and reaffirmed by Congress, reflects that any historic state police powers must yield to this clear and manifest purpose." (*Scheiding, supra*, at pp. 481–482.)

 *Scheiding* also rejected the contention that the BIA does not apply to locomotive manufacturers. " 'This distinction [between locomotive manufacturers and operators] is without significance. The BIA preempts any state action that would affect "the design, the construction, and the material" of locomotives. [Citation.] Imposing tort liability on railroad equipment manufacturers would do just that, by forcing them to conform to design and construction standards imposed by the states. This would transfer the regulatory locus from the Secretary of Transportation to the state courts—a result the BIA clearly intended to foreclose. [Citation.]' [Citations.]" (*Scheiding, supra*, 22 Cal.4th at p. 483.)

Plaintiffs nevertheless argue that *Scheiding* is not controlling and dispositive authority in the instant case because it specifically refrained from ruling on whether injuries that occurred while a locomotive is not "in use" are within the preemptive scope of the BIA.[4] (See *Scheiding, supra*, 22 Cal.4th at pp. 483–484, fn. 5 [refusing to consider argument not raised in appellate court].) Arguing against preemption, plaintiffs insist that the BIA applies only to trains that are "in use" on the railroad lines and therefore does not govern redress for injuries that resulted from work on the equipment in roundhouses and repair shops. It is plaintiffs' position that BIA preemption should "mirror" its application and only apply when the locomotive is "in use" on the "railroad line."

 Scant authority discussing the "in use" limitation vis-à-vis the preemptive scope of the BIA exists. What authority does exist suggests that the "in use" limitation is immaterial to a BIA preemption analysis. For example, in *Seaman v. A.P. Green Industries, Inc.* (N.Y.Sup.Ct. 2000) 184 Misc.2d 603 [707 N.Y.S.2d 299], a New York trial court decision concerning multiple actions brought by railroad workers involving state torts claims for asbestos-related injuries, the court dismissed the actions as being preempted by the BIA (*id.*, 707 N.Y.S.2d at p. 300). There, as here, the plaintiffs claimed the BIA did not preempt their claims because the BIA applied only to operating locomotives in use and not nonoperational locomotives being repaired or

---

[4] Plaintiffs further argue that *Scheiding* was wrongly decided, but acknowledge that we are bound to follow it under principles of stare decisis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

maintained. (*Seaman,* at p. 300.) After discussing *Napier,* the trial court concluded that it was "irrelevant whether the plaintiff was exposed to asbestos from locomotives in use or 'off-line', because a locomotive's design, construction, parts and materials, which are regulated by the BIA, are the same whether or not the locomotive is in use." (*Id.* at p. 302.) Likewise, in *Norfolk S. Ry. Co. v. Bogle* (2006) 166 Ohio App. 3d 449 [2006 Ohio 1540, 850 N.E.2d 1281, 1286], an appellate court decision from Ohio, reversed on other grounds (2007) 115 Ohio St. 3d 455 [2007 Ohio 5248, 875 N.E.2d 919, 926–927], the court noted: " 'Whether a locomotive is off-line in a repair shop or moving interstate, the []BIA preempts state tort law . . . .' " (Quoting *Darby v. A-Best Products Co.* (Ohio App., Dec. 19, 2002, No. 81270) 2002 WL 31839197 [nonpub. opn.], affd. 102 Ohio St. 3d 410 [2004 Ohio 3720, 811 N.E.2d 1117].)

■ Plaintiffs provide no authority to the contrary, but instead rely on cases brought under the FELA, which require that a locomotive be "in use" at the time of the injury before the BIA applies. (See *Compton v. Southern Pacific Co.* (1945) 70 Cal.App.2d 267, 275 [161 P.2d 40] (*Compton*); see also *Pinkham v. Maine Cent. R. Co.* (1st Cir. 1989) 874 F.2d 875, 881; *Angell v. Chesapeake & O. Ry. Co.* (4th Cir. 1980) 618 F.2d 260, 262; *Haworth v. Burlington Northern & Santa Fe Ry.* (E.D.Wn. 2003) 281 F.Supp.2d 1207, 1211.) However, courts have consistently recognized that the purpose of the "in use" limitation is to give the railroads the opportunity to inspect for and correct defective conditions before being exposed to strict liability.[5] (See *Phillips v. CSX Transp., Inc., supra,* 190 F.3d at p. 288; *Angell v. Chesapeake & O. Ry. Co., supra,* 618 F.2d at p. 262; see also *Horibin v. Providence & Worcester R. Co.* (D.Mass. 2005) 352 F.Supp.2d 116, 119; *Paul v. Genesee & Wyoming Industries, Inc.* (W.D.N.Y. 2000) 93 F.Supp.2d 310, 317; *Williams v. Norfolk Southern Ry. Co.* (W.D.Va. 2000) 126 F.Supp.2d 986, 990; *Brasier v. Norfolk Southern Ry., supra,* 896 So.2d at pp. 473–474; *Wagner v. Union Pacific RR. Co.* (2002) 11 Neb.Ct.App. 1 [642 N.W.2d 821, 836]; *Bardin v. Consolidated Rail Corp.* (2000) 704 N.Y.S.2d 710, 712 [270 A.D.2d 696]; *Port Terminal Railroad Ass'n v. Jones* (Tex.Ct.App. 2002) 82 S.W.3d 126, 133.)

The threshold issue in FELA cases is determining the "point the railway becomes absolutely liable for injuries caused by defective equipment under the [BIA]." (*Angell v. Chesapeake & O. Ry. Co., supra,* 618 F.2d at p. 262; see also *Crockett v. Long Island R.R.* (2d Cir. 1995) 65 F.3d 274, 277.) Recognizing that Congress intended that strict liability under the BIA apply

---

[5] Inasmuch as the "in use" language in the BIA is substantially similar to the language in the SAA, courts have interchangeably applied case law in interpreting the BIA and SAA. (See *Brasier v. Norfolk Southern Ry.* (Ala. 2004) 896 So.2d 471, 474, fn. 4; *Phillips v. CSX Transp., Inc.* (4th Cir. 1999) 190 F.3d 285, 288, fn. 2.)

only when the locomotive is actually in use, courts have attempted to demarcate the temporal limits of the BIA. (See *Angell v. Chesapeake & O. Ry. Co., supra*, 618 F.2d at p. 262 ["Congressional intent and the case law construing the statute exclude those injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility." (fn. omitted)]; see also *Phillips v. CSX Transp., Inc., supra*, 190 F.3d at p. 289 [noting there is no bright-line test for determining whether railcar is in use; courts must look at " 'a number of different factors,' the most important of which are 'where the train was located at the time of the accident and the activity of the injured party' "].) It is within this context that the "in use" limitation affects whether the BIA will apply in a given case.

*Compton, supra*, 70 Cal.App.2d 267, relied on by plaintiffs, actually supports the conclusion that the "in use" limitation relates to whether strict liability will be imposed. There, a machinist, who was injured while working on a locomotive in a roundhouse, sued the defendant railroad for violations of the BIA. (70 Cal.App.2d at pp. 267–268.) After analyzing various cases interpreting the SAA, which like the BIA imposes absolute liability for safety violations, the court concluded the BIA did not apply to the machinist's injuries. (70 Cal.App.2d at pp. 269–270.) In reaching this conclusion, *Compton* considered, among other things, the purpose of imposing absolute liability on railroad carriers: " 'Assuming it to be the wise and humane purpose of the act to secure the utmost of safety to travelers and employees upon the highways of interstate commerce, whatever may be the source of the dangers which threaten it, it becomes the clear duty of the carrier in conformity with such purpose, as was suggested by this court [citation], to exercise a high degree of diligence in discovering and repairing defects in its safety appliances and in withdrawing the car from commercial use while they exist. Such diligence seems also to be imposed on the carrier by the [BIA] [citation] and related statutes. Can it be said that it is the intention of the [SAA] to penalize such diligence by extending the absolute liability of the carrier through the period of replacement and repair, and reaching even a case where the insecure condition of the appliance which failed was the natural and temporary result of the reconditioning process? We think such contention untenable, unless supported by specific direction of the statute.' " (*Id.* at pp. 271–272.)

After discussing the difference between the broad liability under the FELA and the comparatively narrow circumstances under which liability arises under the BIA and SAA, *Compton* concluded: "These cases clearly establish that a locomotive sent to a roundhouse for temporary repairs, is not, while undergoing such repairs, in 'use' on the carrier's 'line' and is not, therefore, within the provisions of the [BIA]." (*Compton, supra*, 70 Cal.App.2d at

p. 275.) In reaching this conclusion, the court also looked at the plain language of the BIA, which it deemed "was carefully framed to state the thought that the absolute liability being imposed only applied while the locomotive was in actual use on the 'line' of the company in 'active service.' " (*Compton, supra,* at p. 276.)

■ Neither *Compton* nor the FELA cases cited by plaintiffs undermine the broad preemptive scope of the BIA. Whether the BIA "applies" in FELA claims for purposes of imposing strict liability is immaterial to our preemption analysis. The preemptive scope of the BIA "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." (*Napier, supra,* 272 U.S. at p. 611.) There is no indication Congress intended the BIA's broad preemptive scope to be circumscribed by the location of the locomotive. Rather, the BIA is directed at the *subject* of locomotive equipment, which is "peculiarly one that calls for uniform law . . . ." (*Penna. R. R. Co. v. Pub. Service Comm.* (1919) 250 U.S. 566, 569 [63 L.Ed. 1142, 40 S.Ct. 36]; see also *Napier, supra,* 272 U.S. at p. 612.)

Plaintiffs' assertion that states may regulate the design of locomotive parts off line would require railroad manufacturers to meet conflicting state standards off and on line; or, assuming no conflict, to meet the most stringent state regulation. Either way the goal of national uniformity would be substantially impaired. As *Law* explains: "Apart from compensating victims of accidents for their injuries, the purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state. [Citation.] A railroad equipment manufacturer found to have negligently designed a braking system, for example, is expected to modify that system to reduce the risk of injury. If the manufacturer fails to mend its ways, its negligence may be adjudged willful in the next case, prompting a substantial punitive damages award. If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Either way, Congress's goal of uniform, federal railroad regulation would be undermined. [Citation.]" (*Law, supra,* 114 F.3d at pp. 910–911; cf. *Carrillo v. ACF Industries, Inc., supra,* 20 Cal.4th at pp. 1168–1169 [finding same rationale applies under SAA].) Standardization of locomotive equipment is "vital, and employees depend upon the certainty that at all times and in all weather conditions they 'will find them in like place and of like size and usefulness on all cars, from whatever line of railway or section of the country they may come.' [Citations.] Permitting state tort claims 'would generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to

avoid.' (*Ouellette v. Union Tank Car Co.* (D.Mass. 1995) 902 F.Supp. 5, 10.)" (*Carrillo v. ACF Industries, Inc., supra*, 20 Cal.4th at pp. 1163–1164.)

We are equally unpersuaded the BIA does not apply to plaintiffs' state tort claims by operation of the presumption against preemption. As in *Scheiding*, "[w]e question plaintiffs' premise that rail workers' health and safety are concerns primarily within the historic police powers of the states." (*Scheiding, supra*, 22 Cal.4th at p. 481.) In regard to rail safety, "uniformity has long been the congressional touchstone." (*Ibid.*) Moreover, as *Scheiding* observed, "the Supreme Court considered this factor in *Napier*, but nevertheless determined the BIA occupies the entire field of locomotive equipment regardless of the salutary purpose of any additional state requirement. (*Napier, supra*, 272 U.S. at pp. 610–611 . . . .)" (*Id.* at p. 482.) Thus, "[h]aving occupied the field, Congress left no area within which states may act." (*Ibid.*)

Finally, we address plaintiffs' assertion that a finding of preemption effectively immunizes Vapor from liability for its defective product. "Their contention assumes we write on a clean slate, but we do not. *Napier* has long established that Congress 'intended to occupy the field' of locomotive equipment (*Napier, supra*, 272 U.S. at p. 613 . . .), a field that extends to the 'design' of such equipment. (*Id.* at p. 611 . . . .)" (*Scheiding, supra*, 22 Cal.4th at p. 481.) Nor are we in a position to second-guess Congress's decision to require national uniformity in the field of railroad safety.

The imposition of tort liability on railroad manufacturers clearly would affect the design, the construction and the material of locomotives (*Napier, supra*, 272 U.S. at p. 611), and thus, is within the preemptive scope of the BIA. We do not ignore or take lightly the state interest in protecting its citizens from defective products, but as " '*Law* explains, the imposition of tort liability on railroad equipment manufacturers would force them to conform to design and construction standards imposed by the states. "This would transfer the regulatory locus from the Secretary of Transportation to the state courts—a result the BIA was clearly intended to foreclose. [Citation.]" (*Law, supra*, [114 F.3d] at pp. 911–912, fn. omitted.)' " (*Scheiding, supra*, 22 Cal.4th at p. 477.)

Our conclusion is compelled by *Scheiding*, which is consistent with an avalanche of state and lower federal court decisions holding firm to the *Napier* principle that the BIA preempts state tort actions. (See *In re West Virginia Asbestos Litigation* (2003) 215 W.Va. 39 [592 S.E.2d 818, 824] [BIA preempts state tort claims against manufacturers of locomotive equipment containing asbestos], cert. den. *sub nom. Abbott v. A-Best Products Company*

(2006) ___ U.S. ___ [166 L.Ed.2d 39, 127 S.Ct. 155]; *Darby v. A-Best Products, Co.* (2004) 102 Ohio St. 3d 410 [2004 Ohio 3720, 811 N.E.2d 1117, 1125–1126] [BIA preempts state tort claims against manufacturers of asbestos-containing locomotive parts], cert. den. (2005) 543 U.S. 1146 [161 L.Ed.2d 106, 125 S.Ct. 1297]; *General Motors Corp. v. Kilgore* (Ala. 2002) 853 So.2d 171, 176–177 [BIA preempts state wrongful death action against manufacturer of locomotive built with asbestos-containing parts]; see also *Forrester v. American Dieselelectric, Inc.* (9th Cir. 2001) 255 F.3d 1205, 1209–1210 [BIA preempts nonemployee product liability action against manufacturer of locomotive crane]; *Oglesby v. Delaware & Hudson Railway Co.* (2d Cir. 1999) 180 F.3d 458, 460–461 [BIA preempts common law claims against locomotive seat manufacturer], cert. den. *sub nom. Oglesby v. General Motors Corp.* (1999) 528 U.S. 1004 [145 L.Ed.2d 384, 120 S.Ct. 498]; *Springston v. Consolidated Rail Corp.* (6th Cir. 1997) 130 F.3d 241, 244–245 [BIA preempts state tort claims for inadequate warning devices brought by motorist struck by train], cert. den. (1998) 523 U.S. 1094 [140 L.Ed.2d 792, 118 S.Ct. 1560]; *First Sec. Bank v. Union Pacific R. Co.* (8th Cir. 1998) 152 F.3d 877, 880 [BIA preempts state common law claims against locomotive manufacturers for injuries arising out of alleged design defects]; *Marshall v. Burlington Northern, Inc.* (9th Cir. 1983) 720 F.2d 1149, 1151–1154 [BIA preempts state tort claims for inadequate on-train warning devices brought by motorist struck by train]; *In re Train Collision at Gary, Indiana* (Ind.Ct.App. 1996) 670 N.E.2d 902, 910–911 [BIA preempts claims regarding design and structure of train cars], cert. den. *sub nom. Dillon v. Northern Indiana Commuter Transportation District* (1997) 522 U.S. 914 [139 L.Ed.2d 230, 118 S.Ct. 299].) Although we recognize that cases from other jurisdictions, both state and federal,[6] are not controlling we find them persuasive in their consistent recognition of the expansive scope of the BIA as articulated by the United States Supreme Court in *Napier.*

██ "Through the BIA, the federal government has established a comprehensive, national regime of locomotive regulation." (*Law, supra,* 114 F.3d at p. 912, fn. omitted.) Because plaintiffs' state tort causes of action fall squarely within this preempted field, the trial court correctly sustained Vapor's demurrer without leave to amend.[7]

---

[6] California courts are not constrained by opinions of lower federal courts, even on federal questions. (See, e.g., *Service Employees Internat. Union v. County of Los Angeles* (1990) 225 Cal.App.3d 761, 768 [275 Cal.Rptr. 508].)

[7] Because the finding of preemption is dispositive, we need not address Vapor's alternate argument that the demurrer was properly sustained because the complaint fails to identify any product attributable to Vapor. (See, e.g., *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 [86 Cal.Rptr.2d 846, 980 P.2d 398].)

## IV. DISPOSITION

The judgment is affirmed. Vapor is entitled to its costs on appeal.

Ruvolo, P. J., and Sepulveda, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 26, 2008, S161100. Kennard, J., Chin, J., and Corrigan, J., did not participate therein.