Filed 12/13/24  Snell v. BNSF Railway Company CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DAVID S. SNELL, | |
| Plaintiff and Respondent, | G063079 |
| v. | (Super. Ct. No. CIVDS1828151) |
| BNSF RAILWAY COMPANY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and postjudgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge. Affirmed.

Pacific Employment Law, Joseph P. Mascovich; Schroeder Schaff & Low, Joseph P. Mascovich; Lewis Brisbois Bisgaard & Smith, Anthony E. Sonnett and Jeffry A. Miller for Defendant and Appellant.

Law Offices of Ruel Walker, W. Ruel Walker; Hildebrand, McLeod & Nelson, Anthony S. Petru and Victor A. Russo for Plaintiff and Respondent.

\*       \*       \*

David S. Snell was grievously injured while he was working for the BNSF Railway company (the Railroad) as one member of a crew carrying out a shoving movement.[1] Following what was apparently a serious miscommunication, the foreman of the three-person crew directed the locomotive operator to back up when he was unaware that Snell was on the track attempting to clear a switch. The locomotive hit Snell and dragged him down the track before the other crewmembers realized what had happened.

Snell sued the Railroad alleging theories of common law negligence as well as liability under the Federal Employers' Liability Act (FELA), 45 United States Code Annotated section 51 et seq., based on its alleged violation of several safety regulations promulgated by the Federal Railroad Administration (FRA).

The jury found that both sides were negligent in causing the accident; it awarded Snell $19,548,380 in damages and apportioned blame 70 percent to the Railroad and 30 percent to Snell. The jury also concluded the Railroad violated part 218.99 of title 49 of the Code of Federal Regulations (2022), which was a cause of the accident. That finding meant the Railroad was liable under FELA, and Snell's damages would therefore not be reduced based on his 30 percent comparative fault.

---

[1] A shoving movement occurs when railroad locomotives are used to push railroad cars for short distances, rather than pull them.

The Railroad appeals, arguing that when the provisions of part 218.99 of title 49 of the Code of Federal Regulations (2022) are properly interpreted, there is no evidence to support the jury's finding that it violated those provisions, and thus that the court erred by denying its motion for a partial judgment notwithstanding the verdict (JNOV). The Railroad claims the evidence establishes Snell's negligence was solely responsible for the accident.

We disagree. We therefore affirm the judgment and postjudgment order.

Part 218.99 of title 49 of the Code of Federal Regulations requires that during a shoving operation, "a crewmember or other qualified employee" must provide "point protection" (49 C.F.R. § 218.99(b)(3) (2022)), which is defined as "[v]isually determining that the track is clear" (49 C.F.R. § 218.99(b)(3)(i) (2022)) *and* "[g]iving signals or instructions necessary to control the movement" (49 C.F.R. § 218.99(b)(3)(ii) (2022)). It also requires that before a shoving operation begins, the Railroad must conduct a "Job briefing" between the engineer and the employee who will be directing the movement of the locomotives and that the briefing must address "the means of communication to be used between the locomotive engineer and the employee directing the move and how point protection will be provided." (49 C.F.R. § 218.99(b)(1) (2022).)

The Railroad contends it is undisputed that it conducted a job briefing that complied with the requirements of part 218.99 of title 49 of the Code of Federal Regulations (2022). Again, we disagree. The record before us indicates that, to the extent there was a job briefing, it did not specifically address the required subjects.

3

The record also demonstrates the Railroad did not comply with the point protection requirement. Although Snell was the only crewmember on the track, and therefore the only crewman who could "visually determin[e] that the track is clear" (49 C.F.R. § 218.99(b)(3)(i) (2022)), it was the foreman of the three-man crew who decided, based on his apparent misunderstanding of Snell's radio communication, that he would "control the movement" (49 C.F.R. § 218.99(b)(3)(ii) (2022)) and instruct the engineer to proceed down the track to where Snell was.

Although the Railroad argues it complied with part 218.99 of title 49 of the Code of Federal Regulations, because the foreman relied on what he believed was Snell's visual determination that the track was clear, the rule allows for no such delegation. It requires that a single "crewmember or other qualified employee" (49 C.F.R. § 218.99(b)(3) (2022)) act as point protection which includes both visually determining the track is clear, and the control of the movement. Because the record demonstrates the foreman could not visually determine the track was clear before he directed movement of the locomotives, the Railroad also violated the point protection requirement.

FACTS

The accident took place on the night of December 31, 2016. Snell reported for work at the Railroad's railyard in San Bernardino, where he was part of a crew performing a "switching" job, i.e., moving tank cars at the Liquid Sugars industry (LSI) plant, which was located within the boundary of the railyard.

The other members of the three-person crew were Steve Blackmur, the locomotive engineer, and Dave White, a conductor who was acting as foreman of the crew.

4

The crew was initially briefed by the Railroad's trainmaster, after which White led a briefing with Snell and Blackmur. All three crewmembers had radios to communicate with one another during the switching job.

The crew connected two locomotive engines to the full tank cars that were designated for delivery to LSI. Once Snell and White attached these cars to the locomotives, Blackmur operated the locomotives to shove the cars toward LSI. Snell and White both rode on the train to the point where the track leading to LSI splits off from the main line track.

When they reached the split point, White and Snell had a further conversation, and each then began to perform his own tasks. White walked to the plant entrance and went inside. He located the tank cars that had to be pulled out of the plant, removed the derail[2] and set (lined) the switch on the rails inside the plant.

Snell's responsibility was to first direct Blackmur to shove the train on the main tracks past the switch that can be used to connect those tracks to the LSI track; he then disconnected the full tank cars from the locomotives (which were expected to later connect to empty cars within the LSI plant) and directed Blackmur to move the locomotives back to the other side of the switch.

Once the locomotives were on the other side of the switch and stopped, Snell's next task was to adjust (line) the switch so that it would redirect the train onto the tracks leading into the plant. Normally, that adjustment would be accomplished at a switch stand located near the tracks.

---

[2] The derail is a safety device that prevents rail cars from accidentally rolling out from a side track on to the main track. It must be removed before such movements between those tracks can be made.

However, in this case, when Snell attempted to move the switch using the switch stand, the switch would not move. He suspected there was debris blocking the switch, which he said frequently occurred. Snell then began looking for a stick or a similar object he could use to clear debris from the switch.

Consistent with the plan that White and Snell had agreed to, in which Snell was responsible for directing Blackmur's movement of the locomotives across the switch, Snell believed the locomotives would remain in place until he directed their movement, and thus that it would be safe for him to go on to the track to clear out the switch points.

While Snell was still working on clearing the switch, White completed his own tasks inside the plant. He then radioed Snell, whom he could not see, saying only "All lined up, Snell."

Because the two men had agreed that White would confirm to Snell when he had properly lined the switch and removed the derails inside the LSI facility, Snell interpreted White's communication as a statement informing him that White had done that. A few seconds later, Snell replied "Copy"; he meant this to only confirm that he had heard White's transmission.

White, on the other hand, had intended his transmission to be a question: i.e., "[Are you a]ll lined up, Snell[?]" When Snell responded "Copy," White interpreted that response to mean, "Yes."[3]

---

[3] White acknowledged in his testimony that, although it was his intention in the radio communication to find out if Snell was "in the clear," he never specifically asked Snell that question.

Although White could not see either Snell or the switch points from his position inside the plant, he decided to take over directing the movement of the locomotives at that time, based on what he believed was Snell's confirmation that the switch outside had been properly lined up. Thus, White stated "Roger that," and then announced he was taking over the point protection ("foreman has the point from the ground"). White then directed Blackmur to move: "Back up, start job with, uh, eight cars." "[Derails] are dirty." Blackmur replied "Come back eight, 303."

Another train with four locomotive engines was moving past Snell on the next track at that moment, and "[l]ocomotives are unbelievably loud." As a result, Snell did not hear the exchange between White and Blackmur; he was therefore not aware White had claimed the point and taken over responsibility for directing movement of the locomotives.

Thinking he was still in control of the movement of the locomotives, Snell stepped onto the track to work on cleaning the switch. While he was bent over and engaged in that task, the locomotives driven by Blackmur hit him from behind.[4] Snell was knocked over and dragged more than 30 feet as the locomotives passed over him.

When White realized the locomotives had not been switched over to the rail line going into the LSI plant, but were instead continuing along past the switch on the main rail line, he ordered Blackmur to stop. When the two of them located Snell under the locomotives minutes later, Snell yelled at them, repeatedly asking why the locomotives had moved. White and

---

[4]  Snell explained he chose to face the direction of the oncoming train on the next track, rather than the locomotives involved in his operation because he assumed that the other train presented the more immediate potential danger to him.

Blackmur responded they thought Snell had said "copy," to which Snell responded, "[C]opy . . . means I heard you." Although Snell never lost consciousness, he sustained severe physical and emotional injuries.

Snell filed his lawsuit against the Railroad, alleging theories of general negligence and for liability under FELA based on the Railroad's violation of several railroad safety regulations.

The case was tried, and the jury returned a verdict concluding that the Railroad had been negligent, and its negligence caused harm to Snell. The jury also found the Railroad had violated two regulations, part 218.99 and part 220.31 of title 49 of the Code of Federal Regulations (2022), and that the violation of part 218.99 had caused harm to Snell.

The jury found that Snell's own negligence had contributed to the accident, and apportioned responsibility 70 percent to the Railroad and 30 percent to Snell. The jury awarded damages to Snell in the total amount of $19,548,380. The court entered judgment in that amount in favor of Snell.

The Railroad moved for a partial JNOV, arguing the record did not contain substantial evidence proving that a violation of part 218.99 of title 49 of the Code of Federal Regulations (2022) had occurred. The court denied the motion.

## DISCUSSION

### I.

#### BACKGROUND LAW

"FELA is a broad remedial statute based on fault . . . and is intended by Congress to protect railroad employees by doing away with certain common law tort defenses." (*Villa v. Burlington Northern and Santa Fe* (8th Cir. 2005) 397 F.3d 1041, 1045.) It "holds railroad employers liable for the injury or death of railroad employees that results, in whole or in part,

8

from the railroad's negligence or that of its agents." (*Frastaci v. Vapor Corp.* (2007) 158 Cal.App.4th 1389, 1395.)

Although FELA generally applies comparative fault principles, so that a plaintiff's own negligence will reduce recoverable damages, such a reduction is not permitted if a railroad's violation of a safety statute was a cause of the plaintiff's injury. (45 U.S.C. § 53 ["no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee"].) FRA safety regulations are "deemed to be a statute" for purposes of 45 United States Code section 53. (45 U.S.C. § 54a.)

In this case, the jury found that the Railroad violated part 218.99 of title 49 of the Code of Federal Regulations (2022), which was a cause of the accident that injured Snell. Part 218.99 provides, in pertinent part: "(1) Job briefing. Rolling equipment shall not be shoved or pushed until the locomotive engineer participating in the move has been briefed by the employee who will direct the move. The job briefing shall include the means of communication to be used between the locomotive engineer and the employee directing the move and how point protection will be provided. [¶] . . . [¶] (3) Point protection. When rolling equipment or a lite locomotive . . . is shoved or pushed, *point protection shall be provided by a crewmember or other qualified employee by*: [¶] (i) *Visually determining that the track is clear*. The determination that the track is clear may be made with the aid of monitored cameras or other technological means, provided that it and the procedures for use provide an equivalent level of protection to that of a direct visual determination by a crewmember or other qualified employee properly positioned to make the observation as prescribed in this section and

9

appendix D to this part; *and* [¶] (ii) *Giving signals or instructions necessary to control the movement.*" (49 C.F.R. § 218.99(b)(1) & (b)(3) (2022), italics added.)

A related regulation, part 218.93 of title 49 of the Code of Federal Regulations, defines "[t]rack is clear" to mean that "[t]he portion of the track to be used for the intended movement is unoccupied by rolling equipment, on-track maintenance-of-way equipment, and conflicting on-track movements" and that "[i]ntervening switches and fixed derails are properly lined for the intended movement." (49 C.F.R. § 218.93 (2022).)

II

JNOV STANDARD OF REVIEW

As a general rule, when an appellate court reviews an order granting or denying a JNOV, it determines "whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) In other words, when we view the evidentiary record in the light most favorable to the verdict (*Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 829-830), we will not reweigh evidence or assess the credibility of witnesses (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631).

Here the Railroad's substantial evidence argument is grounded on its assertion we must accept its "correct interpretation" of part 218.99(b) of title 49 of the Code of Federal Regulations. We are not persuaded.

We apply a de novo standard of review to the Railroad's regulatory interpretation argument. (*Woods v. Union Pacific Railroad Co.* (2008) 162 Cal.App.4th 571, 579.) We interpret a regulation under the same rules we apply to statutory interpretation. (*Butts v. Board of Trustees of California State University* (2014) 225 Cal.App.4th 825, 835.) We are not bound by the Railroad's interpretation of a statute. The general rule is that

10

when the statutory or regulatory language, standing alone, is clear and ambiguous, we will adopt that literal meaning. (*TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1068, review granted Sept. 25, 2024, S286233.) We do so here.

III

THE RAILROAD'S COMPLIANCE WITH PART 218.99 OF TITLE 49 OF<br>THE CODE OF FEDERAL REGULATIONS

The Railroad contends the trial court erred by denying its motion for a JNOV because the evidence demonstrates as a matter of law that it fully complied with the part 218.99 requirements that it hold a "Job briefing" prior to the shove and provide "Point protection" during the shove. (49 C.F.R. § 218.99(b)(1) & (b)(3) (2022).) The Railroad contends it held a "Job briefing" before the shove because it conducted a meeting that included the three crewmembers who were conducting the shove. The Railroad claims it is "undisputed" that in the context of that meeting, White was the designated employee who would "direct the move," and that the meeting covered "how the shove movement would occur," "the use of radio as the means of communication," and also "that [White] would direct the move as the foreman on the ground."

Our record, which includes testimony from both Snell and engineer Blackmur, does not establish any of those facts as a matter of law.

Blackmur's testimony suggests that, while he did participate in a meeting "when we received our paperwork to do the move," he thought White and Snell "most likely" had what he considered another job briefing just between the two of them. Blackmur believed—contrary to the provisions of part 218.99 of title 49 of the Code of Federal Regulations (2022), which require the "Job briefing" to include the engineer—that it would be a proper

11

practice for White and Snell to "job brief without [him] about what they were going to do."

Contrary to the Railroad's contention that the job briefing requirement established "the use of radio as the means of communication," Blackmur testified he believed the crew would communicate during the shove by "either the radio *or lantern signals*"; he also agreed that when "Snell got to the point where he was going to line the Sugars switch," it was Snell—not White—who was going to communicate with Blackmur "by radio or by hand signals."

Snell testified the meeting between the three crewmembers did not include any detail; instead, White made a general statement that "we'll go to the B yard, we'll switch these out and head over to Liquid Sugars." Snell also testified that it was he, not White, who was responsible for directing Blackmur's movement of the locomotives, which is why he believed it was safe for him to go out onto the tracks to continue his efforts to clear the switch. It is undisputed that Snell had directed Blackmur's movement of the locomotives the first two times they went over the switch, before White unilaterally took over the direction by declaring "Foreman has the point from the ground."[5] None of this confusion is the product of a properly conducted

_____

[5] Snell's expectation was also bolstered by the testimony of his expert, who stated that if White had wanted to begin directing the locomotive movement himself, "he would have to get permission from [Snell] to do that, because [Snell] is in control of the movement." Snell's expert further explained that without getting Snell's permission, it would be improper for White to instruct the engineer to move. While we are not bound by the expert's interpretation of what was required in this situation, we find it persuasive. The regulations allow only one person at a time to be in charge of directing the locomotive's movement; otherwise, the engineer could not be sure whose direction he should be following. This case tragically illustrates

12

"Job briefing" conducted in accordance with part 218.99 of title 49 of the Code of Federal Regulations (2022).

While there is evidence that White and Snell had further conversation about how the shove would be conducted once they got to the area of the LSI plant, that conversation did not qualify as part of the "Job briefing" because it did not include Blackmur, the engineer. The Railroad contends the regulation does not "require that the locomotive engineer be party to the briefings between the crewmembers who are on the ground"; we disagree. The regulation provides for only one type of "Job briefing": one in which "the locomotive engineer participating in the move has been briefed by the employee who will direct the move." (49 C.F.R. § 218.99(b)(1) (2022).)

We reject the Railroad's contention that the brief exchange between White and Blackmur during the shoving operation, in which White declared "he was protecting the point" and then directed Blackmur's movement of the locomotives back over the switch, was a job briefing. Part 218.99 of title 49 of the Code of Federal Regulations (2022) requires the job briefing to take place prior to commencement of the shoving operation, not while the operation is in progress.

Because the evidence is not "undisputed" regarding the Railroad's compliance with the job briefing requirement, we reject the Railroad's position that it complied with that requirement as a matter of law.

The second major requirement of part 218.99 of title 49 of the Code of Federal Regulations is "[p]oint protection," which requires that a person providing point protection—who can be either "a crewmember or other qualified employee"—"[v]isually determin[e] that the track is clear" and

_____

why clarity on that point is critical.

13

"[g]iv[e] signals or instructions necessary to control the movement." (49 C.F.R. § 218.99(b)(3)(i), (ii) (2022).) The regulation provides that the visual "determination that the track is clear may be made with the aid of monitored cameras or other technological means, provided that it and the procedures for use provide an equivalent level of protection to that of a direct visual determination by a crewmember or other qualified employee properly positioned to make the observation . . . ." (49 C.F.R. § 218.99(b)(3)(i) (2022).)

Up until the time White announced "he was protecting the point," just before the accident, the record establishes it was Snell who was providing the point protection. Snell was out on the track near the switch; he was therefore able to visually determine whether the track was clear, and the switch was properly lined up for the intended movement. It was he, not White, who directed Blackmur's movement of the locomotives back and forth over the switch.

What is undisputed is that, while Snell was working on clearing the switch on the track, White purported to take over the point; he then directed Blackmur to move the locomotives. It is also undisputed that at the time White claimed the point, he could not see the switch; he was therefore unable to "visually" determine whether the track was clear for the locomotive movement he directed.

The Railroad nonetheless claims that White's point protection complied with the regulation because he was entitled to rely on Snell's observation that the switch was lined up. According to the Railroad, the fact that the regulation allows the person making the "track is clear" determination to rely on the "aid of monitored cameras or other technological means" (49 C.F.R. § 218.99(b)(3)(i) (2022)), demonstrates it does not obligate him to "personally" determine it. Again, we disagree.

14

The regulation uses the phrase "direct visual determination." Specifically, after stating that the "the crewmember or other qualified employee" providing point protection must "visually" determine that the track is clear, it allows for the use of cameras or other technological means in doing so, but only if those aids "provide an equivalent level of protection to that of a *direct visual determination* by a crewmember or other qualified employee properly positioned to make the observation . . . ." (49 C.F.R. § 218.99(b)(3)(i) (2022), italics added.) In other words, the regulation allows the person making the visual determination to rely on a camera or other technology to do so, but only if the view provided by the camera or other technology is equivalent to the person's own direct view of the scene. That is the standard.

The regulation does not allow for the person providing point protection to rely on the observations of another person as that would be an indirect visual determination. In this case no one actually made a visual determination that the switch was lined up; in fact, it is undisputed that the switch was not lined up. Thus, the regulation's requirement that a visual determination be made was not met—either directly or indirectly.[6]

---

[6] Because we conclude that the visual determination requirement could not have been satisfied by White relying on what he believed was Snell's determination that the track was clear, we need not address the Railroad's assertion that the jury's finding in relation to part 220.45 of title 49 of the Code of Federal Regulations (2022) necessarily means it concluded that White "fully understood" what Snell meant by his "Copy" response before White acted upon it. In fact, the Railroad explicitly conceded there was a "miscommunication" between White and Snell in the trial court while arguing in favor of its motion for a JNOV: "Was there a miscommunication? We know now that there was. That does not mean necessarily that 218.99(b)(3) was violated."

The Railroad argues, "The FRA Operating Practices Compliance Manual (Manual), which is used by FRA inspectors" supports its interpretation of the regulation because it "does not specify that the person protecting the point for the shove must make the 'track is clear' determination. Rather, the Manual states that an inspector should ensure that 'someone visually determines that the track is clear.'" However, the Manual—which as the Railroad acknowledges, provides guidance for inspectors, not for crews carrying out a shoving operation—also does not say that the "someone" who makes the visual determination could be anyone other than the person protecting the point. It does not address the issue at all.[7]

Snell's counsel expressed his point protection argument succinctly in the trial court: "[White] couldn't see if the switch was lined. And we know it wasn't lined. [¶] The regulation does not say anywhere that the person providing point protection can rely on a radio communication from somebody. There's a good reason for that. Radio communications can be misunderstood. That's what happened here. There was an unclear radio communication, a response that was ambiguous, and then Mr. White decided he had the authority to take control of the move. . . . [¶] The regulation says that person in charge of the point protection has to visually see with his own eyes or perhaps through a camera, that can be visually seen that the switch is lined. But nowhere does it say that the person providing point protection can rely on somebody else to tell him that it's lined. He has to see it's lined.

_____

[7] In fact, the Manual requires that an inspector "ensure[s] that 'someone visually determines that the track is clear.'" And as we have already noted, in this case that required visual determination was never made.

That's what the regulation says. And it would have to be rewritten to support [the Railroad's] argument in this case."

We agree. The "point protection" requirement of the regulation requires a single person, either a crewmember or another qualified employee, to provide point protection by completing two tasks: first, visually determining that the "track is clear," and second, "[g]iving [the] signals or instructions necessary to control the movement" of the locomotives. (49 C.F.R. § 218.99(b)(3)(i), (ii) (2022).) Because White was unable to do the first of those things, the Railroad violated part 218.99 of title 49 of the Code of Federal Regulations when he claimed the point and directed Blackmur to move the locomotives.

The trial court did not err in denying the Railroad's motion for a JNOV.

## DISPOSITION

The judgment and postjudgment order are affirmed. Snell is entitled to his costs on appeal.

GOETHALS, J.

WE CONCUR:

MOORE, ACTING P. J.

MOTOIKE, J.

17